Mary Jo C. v. New York State and Local Retirement System et ano.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

August Term, 2011

(Argued: May 3, 2012                    Decided: January 29, 2013)

Docket No. 11-2215

-------------------------------------

MARY JO C.,

<u>Plaintiff-Appellant</u>,

- v -

NEW YORK STATE AND LOCAL RETIREMENT SYSTEM, CENTRAL ISLIP PUBLIC LIBRARY,

<u>Defendants-Appellees</u>.

-------------------------------------

Before:    SACK, RAGGI, <u>Circuit Judges</u>, and SWAIN, <u>District Judge</u>.[*]

Appeal by the plaintiff from a judgment of the United States District Court for the Eastern District of New York (Sandra J. Feuerstein, <u>Judge</u>) dismissing the plaintiff's claims pursuant to Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6).  The district court concluded principally that Title II of the Americans with Disabilities Act does not require state actors to violate state laws as a "reasonable modification" under the Act, and that Title II does not apply to employment

---

[*] The Honorable Laura Taylor Swain, United States District Judge for the Southern District of New York, sitting by designation.

discrimination. Because we conclude that Title II does, in some circumstances, require reasonable departures from standards established by state laws, we vacate the district court's judgment of dismissal in that respect. Because we conclude, based principally on the structure of the Americans with Disabilities Act, that Title II does not apply to employment discrimination, we affirm the district court's judgment of dismissal of that claim.

Affirmed in part; vacated and remanded in part.

WILLIAM M. BROOKS, Mental Disability Law Clinic, Touro College, Jacob D. Fuchsberg Law Center, Central Islip, NY, for Plaintiff-Appellant.

CECELIA C. CHANG, Deputy Solicitor General, (Barbara D. Underwood, Solicitor General, Laura R. Johnson, Assistant Solicitor General, of counsel, on the brief), for Eric T. Schneiderman, Attorney General of the State of New York, New York, NY, for Defendant-Appellee New York State and Local Retirement System.

LAURA L. SHOCKLEY, (William M. Savino, Harris J. Zakarin, on the brief), Rivkin Radler LLP, Uniondale, NY, for Defendant-Appellee Central Islip Public Library.

SASHA SAMBERG-CHAMPION, (Jessica Dunsay Silver, on the brief), Department of Justice, Civil Rights Division, Appellate Section, for Thomas E. Perez, Assistant Attorney General, Washington, DC, for Amicus Curiae United States Department of Justice.

Jo Anne Simon, Jo Anne Simon P.C., Brooklyn, NY, for Amici Curiae Disability Advocates, Inc., DRVT, National Disability Rights Network, and

SACK, Circuit Judge:

The plaintiff alleges that her job as a librarian at the Central Islip Public Library (the "Library") was terminated because of behavior symptomatic of her chronic mental illness. Although she alleges that she would have been eligible for disability retirement benefits under New York State law, her mental illness interfered with her ability to comply with New York State law's strictly enforced filing deadline for those benefits. When the New York State and Local Retirement System (the "NYSLRS") rejected her request to waive the deadline, and when the Library rejected her request to assist her in applying or extending the deadline by reclassifying her termination as a leave of absence, the plaintiff was denied those benefits.

Thereafter, the plaintiff instituted this lawsuit in the United States District Court for the Eastern District of New York against the NYSLRS and the Library alleging, inter alia, that the defendants' actions violated Title II of the Americans with Disabilities Act ("ADA"), Pub. L. No. 101-336, 104 Stat. 327, 327-28 (1990), 42 U.S.C. §§ 12131, et seq. The district court (Sandra J. Feuerstein, Judge) granted the defendants' motion to dismiss because the court concluded principally that Title II of the Americans with Disabilities Act does not require modifications of mandatory requirements imposed by state laws, and that Title II does not apply to employment discrimination.

3

For the reasons set forth below, the district court's judgment of dismissal is vacated as to the plaintiff's Title II claim against the NYSLRS. The case is remanded with instructions to the district court to grant the plaintiff leave to amend her complaint if she so wishes to allege facts supporting her claim that she was disabled, and to attempt to state a claim invoking the rule of Ex parte Young, 209 U.S. 123 (1908), and to conduct further proceedings as warranted. The district court's judgment of dismissal is affirmed as to the plaintiff's Title II claim against the Library. The district court's decision to decline to exercise supplemental jurisdiction over the plaintiff's state law claims is vacated for reconsideration depending on the course of the further proceedings contemplated by this opinion.

**BACKGROUND**

Because this is an appeal from the district court's grant of the defendants' motion to dismiss, we state the facts as drawn from the complaint of the plaintiff "Mary Jo C." -- "accepting all well-pleaded allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor," Bigio v. Coca-Cola Co., 675 F.3d 163, 169 (2d Cir. 2012) (internal quotation marks and brackets omitted) -- and as drawn from matters of which we may take judicial notice, see Tellabs, Inc. v. Makor Issues & Rights, Ltd., 551 U.S. 308, 322 (2007) ("[C]ourts must consider the complaint in its entirety, as well as other sources . . . , in particular, documents incorporated

4

into the complaint by reference, and matters of which a court may take judicial notice."); ATSI Commc'ns, Inc. v. Shaar Fund, Ltd., 493 F.3d 87, 98 (2d Cir. 2007) ("[W]e may consider . . . documents possessed by or known to the plaintiff and upon which it relied in bringing the suit.").

The plaintiff is a "57[-]year-old individual who has suffered from mental illness since adolescence." Complaint ¶ 12, Mary Jo C. v. New York State and Local Ret. Sys., No. 09 Cv. 5635 (E.D.N.Y. Dec. 23, 2009) ("Compl."). She was employed by various Long Island libraries between 1986 and November 2006, becoming a member of defendant NYSLRS in January 1988. Id. ¶¶ 13-14. While working for the Library, her employment was terminated in November 2006 "[a]s a result of behaviors that were symptomatic of her mental illness." Id. ¶ 16. Her last day of work at the Library was on or about November 12, 2006. Id. ¶ 17. After her termination, "libraries in Suffolk County communicated among themselves and agreed that [the plaintiff] should not be hired as a librarian." Id. ¶ 40. The plaintiff asserts that because the libraries "blackballed [her] from working in the public library system in Suffolk County," "it is a virtual certainty that [she] will never work again." Id. ¶¶ 40-41.

In some circumstances, New York provides disability retirement benefits for members of the NYSLRS who are "physically or mentally incapacitated for the performance of gainful employment." See N.Y. Ret. and Soc. Sec. Law § 605(b)(1),

5

(b)(3)(c). According to the Complaint, the plaintiff would have been eligible for disability retirement benefits under New York law had she filed an application with the NYSLRS within three months of her last day of employment. Compl. ¶¶ 18-19. But she "failed to recognize" the filing deadline "because of her mental illness." Id. ¶ 20.

During the three-month period following her termination, the plaintiff's brother spoke to an NYSLRS official, who informed him that the Library could file an application on the plaintiff's behalf. Id. ¶¶ 21-24. On or about February 11, 2007, the plaintiff's brother asked the Library to do so, but the Library denied the request. Id. ¶¶ 25-26. The plaintiff's brother then asked the Library to reclassify the plaintiff's termination as an unpaid leave of absence, which would have extended the time during which the plaintiff could file for benefits, see N.Y. Ret. and Soc. Sec. Law § 605(b)(2), but the Library refused to do that too. Compl. ¶¶ 27-29.

The plaintiff's condition improved in November 2007, and she applied for disability retirement benefits. Id. ¶ 30. The NYSLRS denied the application because it was not filed within three months of the plaintiff's last day of work. Id. ¶ 31. On or about July 23, 2008, the plaintiff requested that the NYSLRS waive the filing deadline as an accommodation under the ADA. The NYSLRS did not respond. Id. ¶¶ 32-33.

6

While awaiting the NYSLRS's response, the plaintiff's brother received notice that the plaintiff could appeal the denial of her disability retirement benefits application, and the plaintiff did so. Id. ¶¶ 34-35. The NYSLRS argued before the hearing officer that state law prohibited it from waiving the filing deadline for any reason. Id. ¶ 36. The hearing officer agreed, denying the plaintiff's appeal because there was no "provision for an extension of the filing deadline" under the applicable state statutes and regulations. Id. ¶¶ 37-38.

Thereafter, on December 23, 2009, the plaintiff brought the instant action in the United States District Court for the Eastern District of New York against the NYSLRS and the Library. The complaint alleges that (1) the NYSLRS violated the ADA by failing to "provide a requested reasonable accommodation" by waiving the filing deadline, (2) the Library violated the ADA and New York Executive Law section 296 by failing to file an application on the plaintiff's behalf, and (3) the Library violated the ADA and New York Executive Law section 296 by failing to reclassify the plaintiff's termination as a leave of absence. Id. ¶¶ 43-52. The plaintiff requested various declaratory judgments, an injunction requiring the NYSLRS to waive the filing deadline (or, if the court determined that an injunction was inappropriate under the ADA, damages), and attorney's fees and costs. Id. at pp. 10-12.

7

Both defendants moved to dismiss the complaint pursuant to Rule 12(b)(6); the NYSLRS also moved to dismiss pursuant to Rule 12(b)(1), asserting that the plaintiff lacked standing and that New York's sovereign immunity barred the plaintiff's claims. On May 5, 2011, the district court denied the NYSLRS's motion to dismiss for lack of subject matter jurisdiction, concluding that the plaintiff had standing to bring her claims. But the court granted the NYSLRS's motion to dismiss because it concluded that the plaintiff could not state a claim under Title II of the ADA, and that the court therefore need not determine whether Congress validly abrogated New York's sovereign immunity when it enacted Title II. The court reasoned that (1) the filing deadline was an essential eligibility requirement not subject to waiver under the ADA, (2) the plaintiff's request for an accommodation was not "reasonable" under the ADA because it would require the NYSLRS to violate state law, and (3) the plaintiff did not allege facts sufficiently plausible on their face to demonstrate, if proven, that she was disabled within the meaning of Title II of the ADA. Mary Jo C. v. New York State and Local Ret. Sys., 2011 WL 1748572, 2011 U.S. Dist. LEXIS 49567 (E.D.N.Y. May 5, 2011). As for the Library's motion to dismiss, the court concluded that the plaintiff's Title II claims against the library failed because her exclusive remedy against the Library was a claim under Title I of the ADA, id. at *12, 2011 U.S. Dist. LEXIS 49567, at *39, further noting that the plaintiff did not refute the Library's

8

contention that the plaintiff had not exhausted her administrative remedies under Title I. id. at *12 n.11, 2011 U.S. Dist. LEXIS 49567, at *39 n.11. The district court then declined to exercise supplemental jurisdiction over the state-law claims, and dismissed the complaint.

The plaintiff appeals.

## DISCUSSION

"We review de novo a district court's dismissal of a complaint under Rule 12(b)(6), accepting all of the complaint's factual allegations as true and drawing all reasonable inferences in the plaintiffs' favor." Forest Park Pictures v. Universal Television Network, Inc., 683 F.3d 424, 429 (2d Cir. 2012) (citing Interpharm, Inc. v. Wells Fargo Bank, Nat'l Ass'n, 655 F.3d 136, 141 (2d Cir. 2011)). The complaint must state a claim that is plausible on its face. Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." Ashcroft v. Iqbal, 556 U.S. 662, 678 (2009). "[A] dismissal pursuant to Rule 12(b)(6) is, at bottom, a declaration that the plaintiff's complaint and incorporated materials are insufficient as a matter of law to support a claim upon which relief may be granted." Halebian v. Berv, 644 F.3d 122, 130-31 (2d Cir. 2011).

I. ADA Title II Claims Against the NYSLRS

A.   Sovereign Immunity

The NYSLRS moved to dismiss on the basis of New York State's and the NYSLRS's sovereign immunity from suit.  The Eleventh Amendment to the United States Constitution provides that "[t]he Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State." U.S. CONST. amend. XI.  The Eleventh Amendment has been interpreted as also barring suits in federal court against a state brought by that state's own citizens.  See Woods v. Rondout Valley Cent. Sch. Dist. Bd. of Educ., 466 F.3d 232, 236 (2d Cir. 2006).  Although NYSLRS is not itself a state, "[t]he immunity recognized by the Eleventh Amendment extends beyond the states themselves to 'state agents and state instrumentalities' that are, effectively, arms of a state."  Id. (quoting Regents of the Univ. of Cal. v. Doe, 519 U.S. 425, 429 (1997)).

"Congress may abrogate the states' Eleventh Amendment immunity when acting pursuant to [Congressional] authority under Section [five] of the Fourteenth Amendment."  Id. (citing U.S. CONST. amend. XIV, § 5; Tennessee v. Lane, 541 U.S. 509, 518 (2004)).  Congress has purported to abrogate the states' sovereign immunity from claims brought against them under Title II of the ADA.  See 42 U.S.C. § 12202.  However, the validity of

this abrogation depends on "whether Congress acted pursuant to a valid grant of constitutional authority." Lane, 541 U.S. at 517 (internal quotation marks omitted).

In United States v. Georgia, 546 U.S. 151 (2006), the Supreme Court established a three-step process for analyzing whether Congress has validly abrogated a state's sovereign immunity from suit in the context of a particular Title II claim:

> [A court must] determine . . . , on a
> claim-by-claim basis, (1) which aspects of
> the State's alleged conduct violated Title
> II; (2) to what extent such misconduct also
> violated the Fourteenth Amendment; and (3)
> insofar as such misconduct violated Title II
> but did not violate the Fourteenth Amendment,
> whether Congress's purported abrogation of
> sovereign immunity as to that class of
> conduct is nevertheless valid.

Id. at 159. Thus, if a plaintiff cannot state a Title II claim, the court's sovereign immunity inquiry is at an end. See Buchanan v. Maine, 469 F.3d 158, 172–73 (1st Cir. 2006) ("If the State's conduct does not violate Title II, the court does not proceed to the next step in the [United States v. Georgia] analysis. The claim ends.").

B. The "Reasonable Modification"
   Requirement of Title II of the ADA

"The ADA was passed by large majorities in both Houses of Congress [in 1990] after decades of deliberation and investigation into the need for comprehensive legislation to address discrimination against persons with disabilities." Lane, 541 U.S. at 516. "Congress found that 'individuals with disabilities continually encounter various forms of

11

discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices . . . .'" Crowder v. Kitagawa, 81 F.3d 1480, 1483 (9th Cir. 1996) (alteration in original) (quoting 42 U.S.C. § 12101(a)(5)). The ADA aims "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. §§ 12101(b)(1). "It forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." Lane, 541 U.S. at 516-17.

"Title II of the ADA[,'Public Services,'] provides that 'no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity,[1] or be subjected to discrimination by any such entity.'" United States v. Georgia, 546 U.S. at 153 (quoting 42 U.S.C. § 12132). The statute "require[s] that covered entities make reasonable accommodations in order to provide qualified

---

[1] The ADA "defines 'public entity' to include 'any State or local government' and 'any department, agency, . . . or other instrumentality of a State.'" United States v. Georgia, 546 U.S. at 154 (quoting 42 U.S.C. § 12131(1)) (some internal quotation marks omitted).

12

individuals with an equal opportunity to receive benefits from or to participate in programs run by such entities."  Tsombanidis v. West Haven Fire Dep't, 352 F.3d 565, 573 (2d Cir. 2003) (internal quotation marks omitted).

> To prove a violation of Title II, a party must therefore establish: (1) that he is a "qualified individual" with a disability; (2) that he was excluded from participation in a public entity's services, programs or activities or was otherwise discriminated against by a public entity; and (3) that such exclusion or discrimination was due to his disability.

Hargrave v. Vermont, 340 F.3d 27, 34–35 (2d Cir. 2003).

> A "'qualified individual with a disability'" is defined as "an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."

United States v. Georgia, 546 U.S. at 153-54 (quoting 42 U.S.C. § 12131(2)).  "A public entity shall make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity."  28 C.F.R. § 35.130(b)(7).[2] "[A] defendant need not make an accommodation at all if the

---

[2] "We have previously made clear that 28 C.F.R. § 35.130(b)(7) was intended to implement 42 U.S.C. § 12131(2)." Hargrave, 340 F.3d at 38; see also infra note 5.

13

requested accommodation 'would fundamentally alter the nature of the service, program, or activity.'" Powell v. National Bd. of Medical Examiners, 364 F.3d 79, 88 (2d Cir. 2004) (quoting 28 C.F.R. § 35.130(b)(7)).

Typically, "the determination of whether a particular modification is 'reasonable' involves a fact-specific, case-by-case inquiry that considers, among other factors, the effectiveness of the modification in light of the nature of the disability in question and the cost to the organization that would implement it." Staron v. McDonald's Corp., 51 F.3d 353, 356 (2d Cir. 1995) (applying same standard in Title III case as under Title II, see infra note 6). It is a factual issue "whether [a] plaintiff['s] proposed modifications . . . amount to 'reasonable modifications' which should be implemented, or 'fundamental alterations,' which the state may reject." Crowder, 81 F.3d at 1485.

C. The District Court's Decision as to Whether the Plaintiff is a "Qualified Individual"

The district court began its analysis of whether the plaintiff adequately alleged that she is a "qualified individual with a disability" by observing that New York State courts have interpreted a similar filing deadline provision as

> a condition precedent to the ripening of any rights" or entitlement to disability benefits, and have [concluded] that the statutory filing period may [not] be extended or waived by the State agency, even where the applicant claims that the disability giving rise to his or her claim for disability benefits also rendered him incapable of

14

asserting his or her claim in a timely manner.

*Mary Jo C.*, 2011 WL 1748572, at *8, 2011 U.S. Dist. LEXIS 49567, at *24-*25 (citations and parenthetical description of cited cases omitted).  Relying on our statement in *Henrietta D. v. Bloomberg*, 331 F.3d 261 (2d Cir. 2003), that the ADA's "use of the term 'qualified' suggests that [courts] must look not to the administration of the program for which the plaintiff is qualified, but rather its formal legal eligibility requirements," *id.* at 277 (citing 42 U.S.C. §§ 12131-32), the court reasoned that because the filing deadline is deemed a condition precedent to eligibility under state law, the "plaintiff seeks a waiver of an essential eligibility requirement for receipt of disability benefits under [New York law], which the State courts have determined the State defendant is without authority to grant." *Mary Jo C.*, 2011 WL 1748572, at *9, 2011 U.S. Dist. LEXIS 49567, at *27.

The district court then concluded that, unlike requiring "reasonable modification of the State defendant's own rules, policies or practices over which it has discretion," "[r]equiring the State defendant to violate state law is not a reasonable accommodation as a matter of law."  *Id.*, 2011 U.S. Dist. LEXIS 49567, at *27.  For this proposition, the court relied principally on *Herschaft v. New York Board of Elections*, No. 00 CV 2748, 2001 WL 940923, 2001 U.S. Dist. LEXIS 11801 (E.D.N.Y. Aug. 13, 2001) (denominated "NOT FOR PUBLICATION"),

15

aff'd on other grounds, 37 F. App'x 17 (2d Cir. 2002) (summary order), in which the court rejected a pro se plaintiff's requested modification of New York State's deadline for gathering signatures for an election nominating petition. Id. at *1, 2001 U.S. Dist. LEXIS 11801, at *1. The Herschaft court opined, without citation to authority, that

> [A] two- to three-week extension[,] . . .
> although not excessive in scope, is
> unreasonable simply because it would require
> the Board of Elections to violate a state
> statute requiring that signatures for
> independent nominating petitions be gathered
> and submitted within a certain time
> frame. . . . The Board of Elections has no
> statutory authority to waive the requirement.
> It is the Court's opinion that an
> accommodation that would require a defendant
> to violate an otherwise constitutional state
> law is inherently unreasonable.

Id. at *6, 2001 U.S. Dist. LEXIS 11801, at *18-*19 (footnote omitted). The district court also cited Aughe v. Shalala, 885 F. Supp. 1428 (W.D. Wash. 1995), which reasoned that modification of a federal statutory age requirement "would essentially rewrite the statute, [so] it must be seen as a fundamental alteration in the nature of the program," id. at 1432.

D. Analysis

1. Whether the Filing Deadline is an Essential Eligibility Requirement. With respect to Title II's requirement that a "qualified individual" meet the "essential eligibility requirements" of a covered program, the district court apparently concluded that so long as a mandatory eligibility requirement is set by a state statute, it will be an "essential eligibility

16

requirement," and any modification of it will work a "fundamental alteration" of the program. On appeal, the NYSLRS argues that "Title II does not require waiver of the essential eligibility requirements for state programs or receipt of state benefits," NYSLRS Br. 13-14, and construes our opinion in Henrietta D. as deciding that "to state a reasonable modification claim under the ADA, the plaintiff must meet the 'formal legal eligibility requirements' for benefits or services," id. at 14 (quoting Henrietta D., 331 F.3d at 277).

At the outset, we note that the portion of Henrietta D. cited by the district court and by NYSLRS arose in an entirely different setting from that presented by this case. There, the state defendant argued that it should be permitted to rebut the plaintiffs' prima facie Title II claim by showing that "the plaintiffs are no less successful in gaining access to benefits than the non-disabled. Such a showing would suggest an alternative reason for the plaintiffs' low rate of obtaining benefits: systemic problems that create obstacles to access for everyone." Henrietta D., 331 F.3d at 277. The issue we confronted was the meaning of the term "benefits" in the statutory command that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity." 42 U.S.C. § 12132; see 331 F.3d at 277.

17

We concluded that the ADA "plainly define[s] benefits by reference to a plaintiff's facial legal entitlements." Henrietta D., 331 F.3d at 277. We reasoned further that "[t]he statute's use of the term 'qualified' suggests that we must look not to the administration of the program for which the plaintiff is qualified, but rather its formal legal eligibility requirements." Id. In context, these statements cannot properly be read to define "essential eligibility requirements" as all "formal legal eligibility requirements." That issue was not before the Henrietta D. court. The only question there was whether the term "benefits" referred to the public program as it was in fact administered, or the program as it was intended to operate by law. See id. Although it looked to the statute's use of the term "qualified" and the regulations' use of the phrase "essential eligibility requirements" in order to construe the statutory term "benefits," id. at 277-78, the Henrietta D. Court did not construe the phrase "essential eligibility requirement" itself. We thus did not determine there that the phrase "essential eligibility requirements" as it is used in 42 U.S.C. § 12131(2) necessarily means a program's "formal legal eligibility requirements." Because Henrietta D. did not resolve the issue before us, we must construe the relevant statutory language in the first instance.

Of course, "[s]tatutory analysis necessarily begins with the plain meaning of a law's text and, absent ambiguity, will generally end there." Bustamante v. Napolitano, 582 F.3d

18

403, 406 (2d Cir. 2009) (internal quotation marks omitted).  At the outset, then, we "review the statutory text, considering the ordinary or natural meaning of the words chosen by Congress, as well as the placement and purpose of those words in the statutory scheme."  United States v. Aguilar, 585 F.3d 652, 657 (2d Cir. 2009) (internal quotation marks omitted).  Here, the relevant text defines a qualified individual as

> an individual with a disability who, with or without reasonable modifications to rules, policies, or practices, the removal of architectural, communication, or transportation barriers, or the provision of auxiliary aids and services, meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity.

42 U.S.C. § 12131(2) (emphases added).  The text thus distinguishes between two categories of requirements: (1) rules, policies, or practices, which are subject to the requirement of reasonable modification, and (2) essential eligibility requirements, which are not.

The fact that Congress provided that "rules, policies, or practices" would be subject to reasonable modification, and contrasted this flexibility with the requirement that a qualified individual meet the "essential eligibility requirements" of a program within the same sentence suggests that Congress meant these categories to have different meanings.  "Generally, identical words used in different parts of the same statute are presumed to have the same meaning.  But where, as here, Congress

19

uses certain language in one part of the statute and different language in another, the court assumes different meanings were intended." Cruz-Miquel v. Holder, 650 F.3d 189, 196 (2d Cir. 2011) (citations and internal quotation marks omitted).

Courts have therefore reasoned that essential eligibility requirements, unlike "rules, policies, [and] practices," 42 U.S.C. § 12131(2), are not subject to reasonable modification or waiver. See Pottgen v. Missouri State High School Activities Ass'n, 40 F.3d 926, 930 (8th Cir. 1994) (observing that when an individual cannot meet an eligibility requirement determined to be essential, "the only possible accommodation is to waive the essential requirement itself. . . . [But] [w]aiving an essential eligibility standard would constitute a fundamental alteration in the nature of the . . . program [at issue].") (footnote omitted); cf. PGA Tour, Inc. v. Martin, 532 U.S. 661, 689 (2001) ("[T]he waiver of an essential rule of [a golf] competition for anyone [under Title III of the ADA] would fundamentally alter the nature of [the] tournaments.").

"[O]ne of the most basic interpretive canons[ is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." Corley v. United States, 556 U.S. 303, 314 (2009) (internal quotation marks and alteration omitted); see also Duncan v. Walker, 533 U.S. 167, 174 (2001) ("It is our duty to give effect, if possible, to every clause and word of a

20

statute." (internal quotation marks omitted)).  In light of the fact that Congress used the phrases "rules, policies, and practices" and "essential eligibility requirements" as two distinct categories, the application of this canon of statutory construction presents a fundamental obstacle to construing "essential eligibility requirements" to mean all "formal legal eligibility requirements," as the district court did and as the NYSLRS would have us do too.

The statute uses the phrase "_essential_ eligibility requirements," not simply "eligibility requirements."  Had Congress intended "all formal legal eligibility requirements" to be non-waivable, the phrase "eligibility requirements" would have sufficed; it would have been unnecessary to use the phrase "_essential_ eligibility requirements."  Title II applies to the "services, programs, or activities of a public entity," 42 U.S.C. § 12132, which, being public, will typically define their eligibility requirements wholly by applicable legal requirements. That is the case here -- all the relevant eligibility requirements for participation in the program are set by law.  If "essential eligibility requirements" meant "all formal legal eligibility requirements," every eligibility requirement would be "essential" and non-waivable, impermissibly rendering the word "essential" superfluous.  Therefore, the term "essential

21

eligibility requirements" does not refer to all formal legal eligibility requirements.[3]

Cases interpreting the "essential eligibility requirement" language indicate that whether an eligibility requirement is essential is determined by consulting the importance of the requirement to the program in question.  See,

---

[3]  NYSLRS argues that the "rules, policies, [and] practices" subject to reasonable modification under Title II do not include state statutes.  See NYSLRS Br. 19 ("Title II . . . requires reasonable modification only of 'rules, policies, or practices' -- not state statutes.").  Our decision in Hargrave indicates, however, that the phrase "rules, policies, or practices" is not to be read so narrowly.  There, the district court had found a Vermont statute to facially discriminate against individuals with mental illnesses when it allowed medical professionals to petition courts to invalidate durable powers of attorney executed by the mentally ill.  340 F.3d at 31-32.  Vermont argued that enjoining execution of the statute "would fundamentally alter programs of civil commitment in Vermont."  Id. at 37 (internal quotation marks omitted).

In rejecting this argument, we first observed that the relevant regulations required "'reasonable modifications in policies [or] practices' in order to avoid discrimination unless the modifications would constitute a fundamental alteration to the relevant 'service, program, or activity.'"  Id. at 38 (quoting 28 C.F.R. § 35.130(b)(7)).  We noted that this language "mirrors" and "implement[s]" the definition of a "qualified individual with a disability" as "'an individual who, with or without reasonable modifications to rules, policies, or practices . . . meets the essential eligibility requirements for . . . participation in programs or activities provided by a public entity.'"  Id. (quoting 42 U.S.C. § 12131(2)).  We rejected Vermont's fundamental alteration argument because "Defendants have failed even to assert clearly, much less show, that the injunction issued by the District Court would fundamentally alter Vermont's program authorizing and enforcing [durable powers of attorney]."  Id.  By implication, the Hargrave court discussed the relevant injunction of the state statute as a "reasonable modification[] to rules, policies, or practices," which did not constitute a "fundamental alteration" of the program.  Id.  Hargrave thus casts doubt on the state's argument that the phrase "rules, policies, and practices" never includes state statutes.

22

e.g., Pottgen, 40 F.3d at 930 ("[T]o determine whether [the plaintiff] is a 'qualified individual' under [Title II of] the ADA, we must first determine whether the age limit is an essential eligibility requirement by reviewing the importance of the requirement to the interscholastic baseball program [at issue]."); id. at 929 (deciding that high school baseball program's age limit was essential because "[a]n age limit helps reduce the competitive advantage flowing to teams using older athletes; protects younger athletes from harm; discourages student athletes from delaying their education to gain athletic maturity; and prevents over-zealous coaches from engaging in repeated red-shirting to gain a competitive advantage. These purposes are of immense importance in any interscholastic sports program.").[4]

---

[4] Pottgen's analysis of the importance of the age requirement is drawn from the Eighth Circuit's discussion of claims under section 504 of the Rehabilitation Act of 1973. "The Rehabilitation Act of 1973 establishes a comprehensive federal program aimed at improving the lot of the handicapped. Among its purposes are to 'promote and expand employment opportunities in the public and private sectors for handicapped individuals and place such individuals in employment.'" Consolidated Rail v. Darrone, 465 U.S. 624, 626 (1984) (quoting 29 U.S.C. § 701(8)), superseded by statute on other grounds as stated in DeVargas v. Mason & Hanger-Silas Mason Co., 911 F.2d 1377, 1383-84 (10th Cir. 1990). Section 504 of the Rehabilitation Act provides that "[n]o otherwise qualified individual with a disability . . . shall, solely by reason of her or his disability, be excluded from the participation in, be denied the benefits of, or be subjected to discrimination under any program or activity receiving Federal financial assistance or under any program or activity conducted by any Executive agency . . . ." Rehabilitation Act § 504, 29 U.S.C. § 794.

Although the Eighth Circuit was discussing claims under section 504 of the Rehabilitation Act, the Pottgen court largely

This reading is reenforced by the regulations implementing[5] the relevant section of the ADA, which require "[a] public entity [to] make reasonable modifications in policies, practices, or procedures when the modifications are necessary to avoid discrimination on the basis of disability, unless the public entity can demonstrate that making the modifications would fundamentally alter the nature of the service, program, or activity." 28 C.F.R. § 35.130(b)(7). The regulations indicate that "essential eligibility requirements" are those requirements

---

adopted its reasoning as to the Rehabilitation Act claims when it analyzed the Title II claims in the case before it. See 40 F.3d at 930-31. Other courts have looked to Rehabilitation Act precedent in deciding cases under Title II of the ADA because Congress intended that the ADA mirror the requirements of the Rehabilitation Act. See Henrietta D., 331 F.3d at 272 ("[A]lthough there are subtle differences between these disability acts, the standards adopted by Title II of the ADA for State and local government services are generally the same as those required under section 504 of [the Rehabilitation Act] of federally assisted programs and activities. Indeed, unless one of those subtle distinctions is pertinent to a particular case, we treat claims under the two statutes identically." (internal quotation marks, brackets, and citations omitted)).

[5] "[T]he Attorney General, at the instruction of Congress, has issued an implementing regulation that outlines the duty of a public entity to accommodate reasonably the needs of the disabled [under Title II]." Wisconsin Cmty. Servs., Inc. v. City of Milwaukee, 465 F.3d 737, 750-51 (7th Cir. 2006) (en banc) (footnote omitted). "We have previously made clear that 28 C.F.R. § 35.130(b)(7) was intended to implement 42 U.S.C. § 12131(2)." Hargrave, 340 F.3d at 38. "The Supreme Court never has decided whether these regulations are entitled to the degree of deference described in Chevron, U.S.A. Inc. v. National Resource Defense Council, Inc., 467 U.S. 837, 844 (1984). Nevertheless, the Court has said that, '[b]ecause the Department of Justice is the agency directed by Congress to issue regulations implementing Title II[,] . . . its views warrant respect.'" Wisconsin Cmty. Servs., 465 F.3d at 751 n.10 (quoting Olmstead v. L.C., 527 U.S. 581, 597-98 (1999)).

24

without which the "nature" of the program would be "fundamentally alter[ed]."  Id.  These terms seem to us clearly to contemplate that some relatively minor eligibility requirements, even if set by statute, will not be deemed essential because they will not be necessary to prevent the fundamental alteration of the program's nature.

The Supreme Court's decision in PGA Tour, Inc. v. Martin, 532 U.S. 661 (2001), further illustrates the point.  The plaintiff in Martin was a professional golfer with a disability that prevented him from walking an 18-hole golf course.  Id. at 668-69.  He requested permission to use a golf-cart in contravention of the PGA's rules as a reasonable accommodation under Title III of the ADA,[6] and the PGA defended on the basis

---

[6] Title III provides that "[n]o individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns . . . or operates a place of public accommodation."  42 U.S.C. § 12182(a).  Courts have read the requirements of Title II and Title III as being consistent with each other:

> The House Committee on Education and Labor indicated that Title II's prohibitions are to be "identical to those set out in the applicable provisions of titles I and III of this legislation."  H.R. Rep. No. 101-485(II), at 84 (1990), reprinted in 1990 U.S.C.C.A.N. 303, 367.  More specifically, the House Report on the ADA states that the prohibitions of discrimination on the basis of association from Titles I and III should be incorporated in the regulations implementing Title II.  Id.; H.R. Rep. No. 485(III), at 51 (1990), reprinted in 1990 U.S.C.C.A.N. 445, 474; see also Kinney v. Yerusalim, 9 F.3d 1067, 1073 n.6 (3d Cir. 1993) (legislative history indicates that

25

that allowing use of the golf-cart would work a fundamental alteration in the nature of the tournament.  Id. at 670-71.

The Court began its analysis by observing two ways in which a modification of the PGA's rules might fundamentally alter the tournament:

> It might alter such an essential aspect of the game of golf that it would be unacceptable even if it affected all competitors equally; changing the diameter of the hole from three to six inches might be such a modification.  Alternatively, a less significant change that has only a peripheral impact on the game itself might nevertheless give a disabled player, in addition to access to the competition as required by Title III, an advantage over others and, for that reason, fundamentally alter the character of the competition.

Id. at 682-83 (footnote omitted).

The Court reasoned that "the use of carts is not itself inconsistent with the fundamental character of the game of golf" because "the essence of the game [is] shotmaking -- using clubs to cause a ball to progress from the teeing ground to a hole some distance away with as few strokes as possible."  Id. at 683.  It

Titles II and III are to be read consistently).

Innovative Health Systems, Inc. v. City of White Plains, 117 F.3d 37, 47 (2d Cir. 1997), recognized as superseded on other grounds by Zervos v. Verizon New York, Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001). "Congress clearly did not intend to give public entities more latitude than private parties to discriminate against the disabled."  Theriault v. Flynn, 162 F.3d 46, 53 n.10 (1st Cir. 1998); see also Bartlett v. New York State Bd. of Law Examiners, 226 F.3d 69, 78 n.2 (2d Cir. 2000) ("In the context of this case, title II and title III of the ADA impose largely the same requirements . . . .").  Therefore, relevant cases interpreting Title III, such as Martin, are instructive here.

therefore concluded that "the walking rule is at best peripheral to the nature of [the PGA's] athletic events, and thus it might be waived in individual cases without working a fundamental alteration." Id. at 689; see also id. at 690 ("A modification that provides an exception to a peripheral tournament rule without impairing its purpose cannot be said to 'fundamentally alter' the tournament."). The PGA's argument to the contrary that "all the substantive rules for its . . . competitions are sacrosanct and cannot be modified under any circumstances [was for that reason] effectively a[n] [incorrect] contention that it is exempt from Title III's reasonable modification requirement." Id. at 689. But "Congress intended that an entity like the PGA . . . carefully weigh the purpose, as well as the letter, of the rule before determining that no accommodation would be tolerable." Id. at 691.

Rather than simply deferring to the entity providing the service in question, deeming the rules as set by that entity as "sacrosanct," id. at 689, and construing any modification of those rules as a fundamental alteration in the nature of the service, the Martin Court undertook an independent analysis of the importance of a rule for the service in light of the service's purpose to determine whether a requested modification would fundamentally alter its nature. Similarly here, we read the ADA to require us to analyze the importance of an eligibility requirement for a public program or benefit, rather than to defer automatically to whatever "formal legal eligibility requirements"

27

may exist, no matter how unimportant for the program in question they may be.[7]

And, perhaps most fundamentally, reading "essential eligibility requirements" to mean all formal legal eligibility requirements seems to us to run counter to the ADA's broad remedial purpose by allowing states to insist that whatever legal requirements they may set are never subject to reasonable modification under Title II of the ADA. Were we to adopt such a construction of the ADA, the class of "rules, policies, or practices" subject to reasonable modification under Title II would be vanishingly small, and nearly all eligibility requirements for the receipt of public services would be non-waivable "essential" eligibility requirements.

"In the ADA, Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] . . . forbid[] discrimination against disabled individuals in major areas of public life, [including] . . . public services . . . ." Id. at 675. "As a remedial statute, the ADA must be broadly construed to effectuate its purpose of providing a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." Noel v. New York City Taxi and

---

[7] Our citation to Martin should in no way be construed as conflating the status of the states' sovereign function of law-making with that of a private entity's rule-making. But Martin persuasively indicates, along with the other considerations discussed, that Title II should not be construed to require automatic deference to a program's formal legal eligibility requirements, however minor they may be.

*Limousine Comm'n*, 687 F.3d 63, 68 (2d Cir. 2012) (internal quotation marks omitted). To adopt the NYSLRS's construction would be to render Title II effectively impotent, which would be contrary to the broad remedial purpose of the ADA -- an act that "has been described as 'a milestone on the path to a more decent, tolerant, progressive society.'" *Martin*, 532 U.S. at 675 (quoting *Bd. of Trustees of Univ. of Ala. v. Garrett*, 531 U.S. 356, 375 (2001) (Kennedy, J., concurring)).

Finally, here, as the plaintiff and the *amici* point out, New York State already waives or extends the filing deadline for disability retirement benefits for certain classes of individuals: For example, an NYSLRS member on unpaid medical leave may file an application within a year after termination of employment, *see* N.Y. Ret. and Soc. Sec. Law § 605(b)(2), and an NYSLRS member with "a qualifying World Trade Center condition" faces no deadline whatsoever, *see id.* The fact that the State itself waives the deadline in the enumerated circumstances strongly suggests that the filing deadline is not "essential." *Cf. Martin*, 532 U.S. at 685 ("[T]he walking rule is not an indispensable feature of tournament golf either. [The PGA] permits golf carts to be used [by non-disabled golfers] in [several of its tournaments other than the one in question]."). At this stage, it cannot be said as a matter of law that the filing deadline is an essential eligibility requirement, and therefore dismissal is inappropriate because it is not clear from the face of the complaint that the plaintiff's allegations are

29

"insufficient as a matter of law to support a claim upon which relief may be granted." Halebian, 644 F.3d at 131.

As the plaintiff points out, "[t]his Court has not yet established a broad rule defining when requirements imposed by a state or local government constitute 'essential eligibility requirements' of a program [so] as to render an individual eligible for protection under Title II of the ADA." Pl.'s Reply Br. 4. Cf. Parker v. Universidad de Puerto Rico, 225 F.3d 1, 4 (1st Cir. 2000) ("Although Title II of the ADA took effect on January 26, 1992, [as of August 2000,] there [was] sparse case[]law interpreting its scope and limits." (footnote omitted)). But we need not do so today. In the posture of this appeal, it is sufficient to conclude that the district court's view that the ADA's reference to "essential eligibility requirements" necessarily refers to each and every formal legal eligibility requirement imposed for participation in a public program or benefit is mistaken. In the context of a motion to dismiss, we ask only whether the complaint states a claim that is in this regard plausible on its face. Twombly, 550 U.S. at 570. For the foregoing reasons, we conclude that it does.

2. Whether Waiving the Filing Deadline Would be a Reasonable Modification. The district court also concluded that "[r]equiring the State defendant to violate state law is not a reasonable accommodation as a matter of law." Mary Jo C., 2011 WL 1748572, at *9, 2011 U.S. Dist. LEXIS 49567, at *27. The court's construction of the term "reasonable modification" thus

30

provided another ground upon which it granted the NYSLRS's motion to dismiss. As a matter of both statutory construction and federal preemption, we must inquire whether Congress, when it enacted Title II's reasonable modification provision, intended to require modification of state laws under certain circumstances, thereby preempting them, or whether it instead intended the reasonable modification provision to stop short of encroaching on state laws. See, e.g., DiFiore v. American Airlines, Inc., 646 F.3d 81, 85 (1st Cir. 2011) ("[F]ederal preemption[] is a question of statutory construction . . . .").

Under the United States Constitution's Supremacy Clause, the "Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land; . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const. art. VI, cl. 2. "Under the doctrine of federal preemption, 'state laws that conflict with federal law are without effect.'" Niagara Mohawk Power Corp. v. Hudson River-Black River Regulating Dist., 673 F.3d 84, 94 (2d Cir. 2012) (quoting Altria Grp. Inc. v. Good, 555 U.S. 70, 76, (2008)). "[T]he purpose of Congress is the ultimate touchstone of pre-emption analysis." Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 516 (1992) (internal quotation marks omitted). "Absent clear congressional intent to the contrary, federal preemption of state law is not favored . . . ." Marsh v. Rosenbloom, 499 F.3d 165, 177-78 (2d Cir. 2007).

31

"Congress may manifest its intent to preempt state or local law explicitly, through the express language of a federal statute, or implicitly, through the scope, structure, and purpose of the federal law." [N.Y. SMSA Ltd. P'ship v. Town of] Clarkstown, 612 F.3d [97, 104 (2d Cir. 2010)]. Thus, preemption "may be either express or implied, and is compelled whether Congress' command is explicitly stated in the statute's language or implicitly contained in its structure and purpose." Shaw v. Delta Air Lines, Inc., 463 U.S. 85, 95 (1983) (internal quotation marks omitted).

Niagara Mohawk Power Corp., 496 F.3d at 95.

"[T]he ADA does not contain an express preemption provision . . . ." Rubietta v. National R.R. Passenger Corp., No. 08 Civ. 7117, 2012 WL 345909, at *4, 2012 U.S. Dist. LEXIS 12047, at *10 (N.D. Ill. Jan 30, 2012). "Courts have recognized two types of implied preemption: (1) field preemption, where Congress has manifested an intent to 'occupy the field' in a certain area . . . ; and (2) conflict preemption, where state law 'actually conflicts with federal law.'" Niagara Mohawk Power Corp., 673 F.3d at 95 (quoting English v. Gen. Elec. Co., 496 U.S. 72, 79 (1990)).

"An actual conflict between state and federal law exists when compliance with both federal and state regulations is a physical impossibility, or when state law is an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." Marsh, 499 F.3d at 177 (internal quotation marks and citations omitted). An actual conflict also exists "where federal law is in 'irreconcilable conflict' with state law."

32

Levitin v. PaineWebber, Inc., 159 F.3d 698, 705 (2d. Cir. 1998)

(quoting Barnett Bank v. Nelson, 517 U.S. 25, 31 (1996)).

> [W]hen the question is whether a Federal act overrides a state law, the entire scheme of the statute must of course be considered and that which needs must be implied is of no less force than that which is expressed.  If the purpose of the act cannot otherwise be accomplished -- if its operation within its chosen field else must be frustrated and its provisions be refused their natural effect -- the state law must yield to the regulation of Congress within the sphere of its delegated power.

Crosby v. National Foreign Trade Council, 530 U.S. 363, 373

(2000) (quoting Savage v. Jones, 225 U.S. 501, 533 (1912)).

"What is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  Id.

"Since preemption claims turn on Congress's intent, we begin as we do in any exercise of statutory construction with the text of the provision in question, and move on, as need be, to the structure and purpose of the Act in which it occurs."  Metropolitan Taxicab Bd. of Trade v. City of New York, 615 F.3d 152, 156 (2d Cir. 2010) (quoting N.Y. State Conference of Blue Cross & Blue Shield Plans v. Travelers Ins. Co., 514 U.S. 645, 655 (1995)) (brackets omitted).  At the outset, we find nothing in the statutory phrase "reasonable modification" to suggest that Congress intended to exclude modifications that require violation or waiver of mandatory state statutes in some circumstances.  In light of the broad scope and purpose of the ADA, we think it

33

unlikely that Congress would have hidden such a significant limitation in such an anodyne statutory phrase.  When Congress did restrict the scope of the ADA, it did so explicitly.  See, e.g., 42 U.S.C. §§ 12208, 12210 (explicitly excluding certain individuals from the definition of "qualified individual with a disability"); id. § 12111(5)(A) (excluding employers having fewer than fifteen employees from the coverage of Title I).

As noted above, "[i]n the ADA, Congress provided [a] broad mandate" to "effectuate its sweeping purpose[ to] . . . forbid[] discrimination against disabled individuals in major areas of public life, [including] . . . public services . . . ." Martin, 532 U.S. at 675.  "Congress found that 'individuals with disabilities continually encounter various forms of discrimination, including outright intentional exclusion, the discriminatory effects of architectural, transportation, and communication barriers, overprotective rules and policies, [and] failure to make modifications to existing facilities and practices . . . .'" Crowder, 81 F.3d at 1483 (alteration in original) (quoting 42 U.S.C. § 12101(a)(5)).  The ADA aims "to provide a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities." 42 U.S.C. § 12101(b)(1).  Title II of the ADA represents Congress's attempt to apply this "clear and comprehensive national mandate" to the "services, programs, or activities," 42 U.S.C. § 12132, of "'any State or local government' and 'any department, agency, . . . or other

34

instrumentality of a State,'" <u>United States v. Georgia</u>, 546 U.S. at 154 (omission in original) (quoting 42 U.S.C. § 12131(1)). And although Congress did not include an express preemption provision, it did include a provision expressly abrogating the sovereign immunity of the states.  <u>See</u> 42 U.S.C. § 12202.

The "natural effect" of Title II's "reasonable modification" requirement, <u>Crosby</u>, 530 U.S. at 373, in light of the foregoing observations, requires preemption of inconsistent state law when necessary to effectuate a required "reasonable modification."  Congress clearly meant Title II to sweep broadly. If all state laws were insulated from Title II's reasonable modification requirement solely because they were state laws, "state law [would serve as] an obstacle to the accomplishment and execution of the full purposes and objectives of Congress" in enacting Title II.  <u>Marsh</u>, 499 F.3d at 177.  Far from "provid[ing] a clear and comprehensive national mandate for the elimination of discrimination against individuals with disabilities," 42 U.S.C. § 12101(b)(1), the ADA would be powerless to work any reasonable modification in any requirement imposed by state law, no matter how trivial the requirement and no matter how minimal the costs of doing so.  We conclude that the ADA's reasonable modification requirement contemplates modification to state laws, thereby permitting preemption of

inconsistent state laws, when necessary to effectuate Title II's reasonable modification provision.[8]

Our conclusion is further supported by Hargrave. There, as we have discussed, we upheld an injunction of a facially discriminatory Vermont statute. Vermont had argued that in the context of the statute and implementing regulation requiring states "to make 'reasonable modifications in policies [or] practices' in order to avoid discrimination unless the modifications would constitute a fundamental alteration to the relevant 'service, program, or activity,'" Hargrave, 340 F.3d at 38 (quoting 28 C.F.R. § 35.130(b)(7)), enjoining the law would fundamentally alter the program at issue. Rejecting this argument and upholding the injunction, we spoke of the "ADA's preemption of these statutory provisions." Id. at 38 n.10 (emphasis added). While the NYSLRS argues that Hargrave "did not hold that Title II preempted facially nondiscriminatory state

---

[8] The same result obtains when considering whether "federal law is in 'irreconcilable conflict' with state law." Levitin, 159 F.3d at 705. As discussed supra Part I.D.1, the relevant provision of the ADA distinguishes between two categories of requirements: "rules, policies, [and] practices" which are subject to reasonable modification, and "essential eligibility requirements," which are not. 42 U.S.C. § 12131(2). As we have seen, not all formal legal eligibility requirements are "essential eligibility requirements," which raises the possibility that, in certain cases, a state law may fall into the category of the "rules, policies, [and] practices" subject to reasonable modification. And if indeed a modification of a state law was found in a particular case to be a "reasonable modification" to a "rule[], polic[y], or practice[]," but the state law in question did not provide for modification in those circumstances, there would be an "irreconcilable conflict" between the dictates of the ADA and state law, necessitating preemption. Levitin, 159 F.3d at 705.

laws or mandated waiver of such laws," NYSLRS Br. at 21, it provides no persuasive reason why, in light of the concerns discussed above, Title II would preempt facially discriminatory laws in pursuit of its broad purpose, but fail to preempt state law when necessary to achieve a reasonable modification to accomplish the same broad goals.

Last, we observe that the proposition that the ADA preempts inconsistent state law when appropriate and necessary to effectuate a reasonable accommodation under Title II is also consistent with decisions from our sister Circuits. See, e.g., Barber v. Colorado Dep't of Revenue, 562 F.3d 1222, 1232-33 (10th Cir. 2009) (ultimately concluding that there was no conflict between state law and the ADA in the case before it, but observing that the court "in no way affirm[ed] the district court's conclusion that '[a]n accommodation that would have required defendants to willfully ignore or violate the law is per se not reasonable.'" (citation omitted)); Quinones v. City of Evanston, Ill., 58 F.3d 275, 277 (7th Cir. 1995) ("[The defendant] believes that it is compelled to follow the directive from the state, but the Supremacy Clause of the Constitution requires a different order of priority. A discriminatory state law is not a defense to liability under federal law; it is a source of liability under federal law." (emphasis in original)); Williams v. Gen. Foods Corp., 492 F.2d 399, 404 (7th Cir. 1974) (similar). As the Ninth Circuit explained:

37

> The court's obligation under the ADA . . . is to ensure that the decision reached by the state authority is appropriate under the law and in light of proposed alternatives. Otherwise, any state could adopt requirements imposing unreasonable obstacles to the disabled, and when haled into court could evade the antidiscrimination mandate of the ADA merely by explaining that the state authority considered possible modifications and rejected them.
>
> We are mindful of the general principle that courts will not second-guess the public health and safety decisions of state legislatures acting within their traditional police powers. However, [under federal] antidiscrimination laws such as the ADA which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to insure that the mandate of federal law is achieved.

Crowder, 81 F.3d at 1485 (citation omitted).

The NYSLRS argues that "Title II . . . requires reasonable modification only of 'rules, policies, or practices' -- not state statutes," NYSLRS Br. 19, and seeks to distinguish Crowder, which contemplated the modification of a mandatory Hawaii State administrative regulation rather than a state statute, see Crowder, 81 F.3d at 1481-85, on this ground, NYSLRS Br. 21 n.6. But as a general rule, duly promulgated state regulations have the force of law for these purposes as do statutes. See, e.g., State v. Kotis, 91 Hawai'i 319, 331, 984 P.2d 78, 90 (1999) (Under Hawaii law, "[a]dministrative rules, like statutes, have the force and effect of law."); Allstate Ins. Co. v. Rivera, 12 N.Y.3d 602, 608, 911 N.E.2d 817, 820, 883 N.Y.S.2d 755, 758 (2009) (under New York law, "[a] duly

38

promulgated regulation . . . has the force of law." (internal quotation marks omitted)).  From the standpoint of the ADA's preemptive force, we can discern no reason to distinguish between the preemption of state statutes and state regulations.  Cf. Crosby, 530 U.S. at 372 n.6 (noting that "a variety of state laws and regulations may conflict with a federal statute" and be preempted).  And for the reasons discussed above, we do not read the ADA to prohibit reasonable modifications to state statutes when appropriate.

We have examined NYSLRS's other arguments regarding Title II and find them unpersuasive.

We therefore conclude that the district court erred in dismissing the plaintiff's Title II claim against the NYSLRS on the ground that "[r]equiring the State defendant to violate state law is not a reasonable accommodation as a matter of law."  Mary Jo C., 2011 WL 1748572, at *9, U.S. Dist. LEXIS 49567, at *27. Because "the determination of what constitutes reasonable modification is [a] highly fact-specific, . . . case-by-case inquiry," "[w]hether the plaintiff['s] proposed alternative" to New York's filing deadline "constitute[s] [a] reasonable modification[] or [a] fundamental alteration[] cannot be determined as a matter of law on the record before us."  Crowder, 81 F.3d at 1485; see also McGary v. City of Portland, 386 F.3d 1259, 1270 (9th Cir. 2004) ("[T]he question of what constitutes a reasonable accommodation under the ADA 'requires a fact-specific, individualized analysis of the disabled individual's

39

circumstances and the accommodations that might allow him to meet the program's standards.'" (quoting Wong v. Regents of Univ. of Cal., 192 F.3d 807, 818 (9th Cir. 1999)).

E.   The District Court's Decision as to Whether the Plaintiff Adequately Alleged that She is Disabled

Again:  Title II of the ADA provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132 (emphasis added).  A "disability" is defined as "(A) a physical or mental impairment that substantially limits one or more major life activities of such individual; (B) a record of such an impairment; or (C) being regarded as having such an impairment . . . ."  42 U.S.C. § 12102(1).  "Major life activities" are further defined to include "caring for oneself, performing manual tasks, seeing, hearing, eating, sleeping, walking, standing, lifting, bending, speaking, breathing, learning, reading, concentrating, thinking, communicating, and working."  42 U.S.C. § 12102(2).

Although neither defendant argued to the district court that the plaintiff had failed to plead adequately that she was "disabled" within the meaning of the ADA, the district court considered the issue sua sponte.  It concluded:

> The complaint does not sufficiently allege
> that plaintiff has a "disability" within the
> meaning of the ADA.  Although plaintiff
> alleges that she has suffered from an

40

unidentified mental illness since adolescence, she does not allege any additional facts plausibly suggesting that such mental illness substantially limited one or more of her major life activities. Accordingly, plaintiff's complaint does not state a cognizable claim under Title II of the ADA. See, e.g., Tylicki v. St. Onge, 297 F. App'x 65, 67 (2d Cir. Oct. 28, 2008) (finding that the plaintiff's complaint did not adequately plead a disability under Title II of the ADA where it contained no allegations describing how his supposed mental condition substantially limited a major life activity).

Mary Jo C., 2011 WL 1748572, at *7, 2011 U.S. Dist. LEXIS 49567, at *21.

Although the district court noted that it "would be possible for plaintiff to amend her Title II claims to sufficiently plead this element as against the Library unless those claims would otherwise be futile," id. at *10 n.7, 2011 U.S. Dist. LEXIS 49567, at *33 n.7, it did not afford the plaintiff this opportunity because it concluded that all of the plaintiff's claims against both defendants were barred on other sufficient, independent grounds.

On appeal, the plaintiff submits that "the failure to provide her with an opportunity to present evidence of disability can be cured by the usual practice of this Court to grant a party leave to amend the complaint on a Rule 12(b)(6) motion." Pl.'s Br. 17 (citing Bellikoff v. Eaton Vance Corp., 481 F.3d 110, 118 (2d Cir. 2007) ("[W]hen a motion to dismiss is granted, the usual practice is to grant leave to amend the complaint." (internal quotation marks omitted))).

41

Inasmuch as the district court thought that it "would be possible" for the plaintiff to amend her allegations regarding her disability such that at least some claims could go forward, Mary Jo C., 2011 WL 1748572, at *10 n.7, 2011 U.S. Dist. LEXIS 49567, at *33 n.7, in light of the fact that the plaintiff has now requested leave to amend on appeal, and since our decision today removes the futility the district court saw in allowing the plaintiff to amend her complaint (at least as to claims against the NYSLRS), we decline to pass on the sufficiency of the plaintiff's allegations of disability on appeal.  Instead, we vacate the district court's decision in this regard, and remand with instructions to grant the plaintiff's motion for leave to amend her complaint to plead adequate allegations of disability if such a motion is made.

F.  Title II's Abrogation of Sovereign Immunity

NYSLRS argues that even if the plaintiff can state a claim against it under Title II, Title II "fails to validly abrogate the State's sovereign immunity for the reasonable modification claim made here."  NYSLRS Br. 22.  The plaintiff responds that, "[a]s appellant Mary Jo C. seeks injunctive relief in connection with her claim against NYSLRS, this Court can avoid adjudication of the Eleventh Amendment issue by permitting the appellant to amend her complaint to" name a state official in his official capacity as a defendant.  Pl.'s Reply Br. 13.

"Under the well-known exception to [the Eleventh Amendment's grant of sovereign immunity from suit] first set

42

forth in Ex parte Young, 209 U.S. 123 (1908), . . . 'a plaintiff may sue a state official acting in his official capacity -- notwithstanding the Eleventh Amendment -- for prospective, injunctive relief from violations of federal law.'" State Employees Bargaining Agent Coalition v. Rowland, 494 F.3d 71, 95 (2d Cir. 2007) (quoting In re Deposit Ins. Agency, 482 F.3d 612, 617 (2d Cir. 2007)); see also Harris v. Mills, 572 F.3d 66, 72 (2d Cir. 2009) (similar).

Because of our well-settled policy of avoiding the unnecessary adjudication of constitutional issues, see generally Horne v. Coughlin, 191 F.3d 244, 246 (2d Cir.), cert. denied, 528 U.S. 1052 (1999), and because the NYSLRS concedes that the "plaintiff could potentially seek injunctive relief from the State Comptroller under Ex parte Young," NYSLRS Supp. Br. 17, we decline to address the constitutionality of Title II's abrogation of the State's sovereign immunity, and remand with instructions to the district court to allow the plaintiff leave to amend her complaint in an attempt to invoke the doctrine of Ex parte Young.

II. Title II Claim Against the Library

A.   The District Court's Decision

The plaintiff also asserted a claim against the Library alleging that its failure to file an application on her behalf or to reclassify her termination as an unpaid leave of absence violated Title II of the ADA.  As noted, the ADA "forbids discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of

43

the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III." Lane, 541 U.S. at 516-17. The district court dismissed this claim because it concluded that the plaintiff, an employee of the Library, could bring a claim against her employer under Title I of the ADA but not under Title II.

Title I of the ADA, "employment," provides in pertinent part that "[n]o covered entity shall discriminate against a qualified individual on the basis of disability in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment." 42 U.S.C. § 12112(a). Title I applies to government employers, which are "covered entities."[9]

Noting that the "Supreme Court" and "the Second Circuit ha[ve] not expressly considered th[e] issue" of whether Title II applies to employment discrimination, Mary Jo C., 2011 WL 1748572, at *11-*12, 2011 U.S. Dist. LEXIS 49567, at *36, and

_____

[9] The term "covered entity" is defined to include an "employer," 42 U.S.C. § 12111(2), which in turn is defined to include a "person engaged in an industry affecting commerce who has 15 or more employees." Id. § 12111(5)(A). The statute further defines "person" as including, see id. § 12111(7); id. § 12111(5)(B), non-federal "governments, governmental agencies, [and] political subdivisions," id. § 2000e(a), and defines "industry affecting commerce as including "any governmental industry, business, or activity," id. § 2000e(h), see generally Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169, 1172 (9th Cir. 1999).

44

acknowledging that "courts are split" on the issue, id. at *11, 2011 U.S. Dist. LEXIS 49567, at *35, the district court followed what it described as the "well-reasoned decisions of the most recent district court cases in this Circuit," to conclude that "Title I of the ADA is the exclusive remedy for plaintiff's claims of discrimination against the Library, all of which relate to the 'terms, conditions, and privileges of [her] employment' with that entity," id. at *12, 2011 U.S. Dist. LEXIS 49567, at *39 (alteration in original) (quoting 42 U.S.C. § 12112(a)).

The district court also cited Zimmerman v. Oregon Dep't of Justice, 170 F.3d 1169 (9th Cir. 1999), as the leading case concluding that public employees' exclusive remedy against their employers under the ADA is Title I. Zimmerman concluded that "Congress unambiguously expressed its intent for Title II not to apply to employment." Id. at 1173. It reasoned that a "common understanding" of the term "services, programs, or activities" in Title II's command that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services, programs, or activities of a public entity," referred "only to the 'outputs' of a public agency, not to 'inputs' such as employment." Id. at 1174.

> First, employment by a public entity is not commonly thought of as a "service, program, or activity of a public entity." Second, the "action" words in the sentence presuppose that the public entity provides an output that is generally available, and that an

45

individual seeks to participate in or receive the benefit of such an output.

Consider, for example, how a Parks Department would answer the question, "What are the services, programs, and activities of the Parks Department?"  It might answer, "We operate a swimming pool; we lead nature walks; we maintain playgrounds."  It would not answer, "We buy lawnmowers and hire people to operate them."  The latter is a means to deliver the services, programs, and activities of the hypothetical Parks Department, but it is not itself a service, program, or activity of the Parks Department.

Similarly, consider how a member of the public would answer the question, "What are the services, programs, and activities of the Parks Department in which you want to participate, or whose benefits you seek to receive?"  The individual might answer, "I want to participate in the Wednesday night basketball league, or find out about the free children's programs for the summer months."  The individual would not logically answer, "I want to go to work for the Parks Department."

Id.

The Zimmerman court concluded that "when viewed as a whole, the text, context and structure of the ADA show unambiguously that Congress did not intend for Title II to apply to employment.  Under these circumstances, we do not resort to legislative history, and we do not defer to the Attorney General's regulation," id. at 1178, which provides that Title II does apply to employment actions against public employers, see 28 C.F.R. § 35.140(a).  Contra Bledsoe v. Palm Beach County Soil & Water Conservation Dist., 133 F.3d 816, 821 (11th Cir. 1998) ("Extensive legislative commentary regarding the applicability of Title II to employment discrimination [in the ADA's legislative

46

history] . . . is so pervasive as to belie any contention that Title II does not apply to employment actions.")

In addition to cases following Zimmerman's analysis, the district court noted dicta from the Supreme Court's decision in Board of Trustees of University of Alabama v. Garrett, 531 U.S. 356 (2001):

> [N]o party has briefed the question of whether Title II of the ADA . . . is available for claims of employment discrimination when Title I of the ADA expressly deals with that subject. See, e.g., Russello v. United States, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks omitted)).

Id. at 360 n.1. Like the district court here, other district courts in this Circuit have cited this language before reaching the conclusion that Title II does not apply to employee claims against a public employer. See Fleming v. State Univ. of N.Y., 502 F. Supp. 2d 324, 332 (E.D.N.Y. 2007).

B. Analysis

"[S]tatutory analysis necessarily begins with the plain meaning of the law's text, and, absent ambiguity, will generally end there." Dobrova v. Holder, 607 F.3d 297, 301 (2d Cir. 2010) (internal quotation marks omitted). "'Because our task is to ascertain Congress's intent, we look first to the text and structure of the statute' as the surest guide to congressional intent." Trustees of Local 138 Pension Trust Fund v. F.W.

47

Honerkamp Co., 692 F.3d 127, 134(2d Cir. 2012) (quoting Lindsay v. Ass'n of Prof'l Flight Attendants, 581 F.3d 47, 52 (2d Cir. 2009)). We are persuaded primarily by the structure of the ADA, including differences between Title I and Title II, that Congress did not intend to extend Title II to employment discrimination claims, at least not those that are covered by Title I, see infra note 12 and accompanying text. See Allard K. Lowenstein Intern. Human Rights Project v. Dep't of Homeland Sec., 626 F.3d 678, 681 (2d Cir. 2010) ("Beginning, as we must, with the plain meaning of the statute's text and structure, we see no ambiguity.").

The ADA is divided into five separate titles: Title I, "Employment"; Title II, "Public Services"; Title III, "Public Accommodations"; Title IV, "Telecommunications"; and Title V, "Miscellaneous Provisions." Americans with Disabilities Act of 1990, Pub. L. No. 101-336, 104 Stat. 327, 327-28 (1990). "'[T]he title of a statute and the heading[s] of [its] section[s]' are 'tools available for the resolution of a doubt' about the meaning of a statute." Almendarez-Torres v. United States, 523 U.S. 224, 234 (1998) (quoting Trainmen v. Baltimore & Ohio R. Co., 331 U.S. 519, 528-29 (1947)). As the Supreme Court indicated in dicta in Garrett, the fact that "Title I of the ADA expressly deals with th[e] subject" of employment discrimination, whereas Title II "deal[s] with the 'services, programs, or activities of a public entity,'" 531 U.S. at 360 n.1 (quoting 42 U.S.C. § 12132), suggests that Congress did not intend Title II to reach employment discrimination, see id. (citing Russello, 464 U.S. at

48

23 ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion" (internal quotation marks omitted))).  And reflecting Congress's decision to separate the ADA into distinct titles covering different kinds of discrimination, the Supreme Court has described the ADA as "forbid[ding] discrimination against persons with disabilities in three major areas of public life: employment, which is covered by Title I of the statute; public services, programs, and activities, which are the subject of Title II; and public accommodations, which are covered by Title III."  Lane, 541 U.S. at 516-17.

The division between Titles I and II is further illustrated by their differing definitions of a "qualified individual."  Title I's definition speaks in terms of employment: "As used in [Title I,] . . . 'qualified individual' means an individual who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires."  42 U.S.C. § 12111(8).  But Title II defines the same term instead as an individual who "meets the essential eligibility requirements for the receipt of services or the participation in programs or activities provided by a public entity."  Id. § 12131(2).

Moreover, Title I prohibits discrimination by a "covered entity," which it defines as, inter alia, "an employer,"

49

id. § 12111(2), whereas Title II prohibits discrimination by a "public entity," which it defines as, inter alia, "any State or local government [or agency thereof]," id. § 12131(1). Thus, "Title II does not include any definition relevant to employ[ment], [by contrast with] Title I[]." Cormier v. City of Meriden, No. 03 Cv. 1819, 2004 WL 2377079, at *4, 2004 U.S. Dist. LEXIS 21104, at *15 (D. Conn. Sept. 30, 2004).

Also, Congress delegated the authority to promulgate regulations under the two titles to two different agencies. Title I gives the Equal Employment Opportunity Commission the authority to promulgate regulations interpreting that title. 42 U.S.C. § 12116. But Title II entrusts the Attorney General with that responsibility. 42 U.S.C. § 12134(a). See also Zimmerman, 170 F.3d at 1178. And the fact that Congress included no direction that the two agencies work together to avoid imposing inconsistent standards governing employment discrimination suits suggests "that it did not intend for the Attorney General to have any power over employment under Title II; it never envisioned that there could be a conflict." Id.

Title I also imposes various limitations on suits against an employer which are absent from Title II. While Title I caps the amount of compensatory damages a plaintiff may recover depending on the number of employees employed by the defendant employer, 42 U.S.C. § 1981a(b)(3), and disallows punitive damages in suits against governmental employers, id. § 1981a(b)(1), "Title II has no such limitations," Cormier, 2004 WL 2377079, at

50

*7, 2004 U.S. Dist. LEXIS 21104, at *26.  And although plaintiffs filing suit under Title I must first exhaust administrative remedies,[10] it appears that those filing suit under Title II need not do so, although we find a conclusion on the point unnecessary to decide this case.[11]  It is an "elementary canon of

_____

[10] Title I incorporates the exhaustion requirement imposed by Title VII of the Civil Rights Act of 1964.

> ADA Title I incorporates various provisions from Title VII of the landmark Civil Rights Act of 1964. . . .  One of these provisions . . . requires a claimant to file a charge of employment discrimination with the EEOC within 180 days after the discriminatory act. See [42 U.S.C.] § 2000e-5(e)(1).

McInerney v. Rensselaer Polytechnic Inst., 505 F.3d 135, 138 (2d Cir. 2007).

[11] Title II adopts the "remedies, procedures, and rights set forth" in the Rehabilitation Act at 29 U.S.C. § 794a.  42 U.S.C. § 12133.  Courts have construed that section of the Rehabilitation Act as not imposing any exhaustion requirement as to claims against a recipient of federal funding, but as imposing one as to claims against a federal employer.  See, e.g., Ryan v. Shawnee Mission Unified Sch. Dist. No. 512, 437 F. Supp. 2d 1233, 1253–54 (D. Kansas 2006).  But "Title II of the ADA is not applicable to the federal government," Cellular Phone Taskforce v. F.C.C., 217 F.3d 72, 73 (2d Cir. 2000), so it would appear that Title II only incorporates the Rehabilitation Act's procedures applicable to recipients of federal funding, and thus does not impose an exhaustion requirement.  Other courts have concluded that Title II contains no exhaustion requirement.  See Bledsoe, 133 F.3d at 824 ("[T]he regulations . . . plainly state that exhaustion is not required." (citing 28 C.F.R. § 35.172, Appendix A ("At any time, the complainant may file a private suit pursuant to section 203 of the Act, 42 U.S.C. [§] 12133, whether or not the designated agency finds a violation."))).

> In Tsombanidis v. West Haven Fire Dept., 352 F.3d 565 (2d Cir. 2003), we strongly suggested that Title II does not impose an exhaustion requirement.

> > It may be that once the governmental entity denies . . . an accommodation, [Title II of] the ADA [does not] require a plaintiff to

51

construction that a statute should be interpreted so as not to render one part inoperative." Mountain States Tel. & Tel. Co. v. Pueblo of Santa Ana, 472 U.S. 237, 249 (1985), (quoting Colautti v. Franklin, 439 U.S. 379, 392 (1979)). "[A]pplying Title II to public employees would nullify these statutory limits for a significant category of employment discrimination plaintiffs." Cormier, 2004 WL 2377079, at *7, 2004 U.S. Dist. LEXIS 21104, at *26. As the Seventh Circuit put it in a similar context -- while analyzing the Rehabilitation Act -- "it would make no sense for Congress to provide . . . different sets of remedies, having different exhaustion requirements, for the same wrong committed by the same employer." McGuinness v. U.S. Postal Serv., 744 F.2d 1318, 1321 (7th Cir. 1984).

---

> exhaust the state or local administrative procedures. But a plaintiff must first use the procedures available to notify the governmental entity that it seeks an exception or variance from the facially neutral laws when pursuing a reasonable accommodation claim.
>
> . . . .
>
> This is not an exhaustion requirement but merely a requirement that plaintiffs first use the proper procedure to seek an exception or variance. If denied this request, they do not need to exhaust the administrative appeal process.

Id. at 579 & n.8 (emphasis in original); see also Cormier, 2004 WL 2377079, at *6, 2004 U.S. Dist. LEXIS 21104, at *22-*23 ("The Second Circuit has not decided the issue, but has suggested that Title II may not require exhaustion."). However, out of an abundance of caution, and because plaintiff does not argue otherwise, we assume for present purposes but do not decide that Title II imposes no exhaustion requirement.

"[W]e are required to disfavor interpretations of statutes that render language superfluous." Conn. ex rel. Blumenthal v. U.S. Dep't of the Interior, 228 F.3d 82, 88 (2d Cir. 2000) (internal quotation marks omitted); see also Corley, 556 U.S. at 314 ("[O]ne of the most basic interpretive canons[ is] that a statute should be construed so that effect is given to all its provisions, so that no part will be inoperative or superfluous, void or insignificant." (internal quotation marks and alteration omitted)); Duncan, 533 U.S. at 174 (similar). If a public employee were able to bring a suit against her employer for wrongful discrimination under both Title I and Title II, Title I would apparently become superfluous in the context of a suit against a public employer employing more than fifteen persons -- compare 42 U.S.C. § 12111(5)(A) (Title I does not apply to an employer with fewer than 15 employees), with 42 U.S.C. § 12131(1)(Title II applies to all municipal entities regardless of size) -- which is a construction we find highly doubtful. Even the plaintiff here concedes nearly as much. See Pl.'s Reply Br. 24 ("[T]he proffered interpretation of Title II does not render Title I entirely redundant.") (emphasis in original).

Accordingly, we conclude that the statute unambiguously limits employment discrimination claims to Title I. A public employee may not bring a Title II claim against his or her

employer, at least when the defendant employer employs fifteen or more employees.[12]

The plaintiff argues that we, like the Bledsoe court, should consult Title II's legislative history. But, having found the relevant provisions of the statute unambiguous, we do not have warrant to do so. See, e.g., Dep't of Hous. & Urban Dev. v. Rucker, 535 U.S. 125, 132 (2002) ("[R]eference to legislative history is inappropriate when the text of a statute is unambiguous."); Ratzlaf v. United States, 510 U.S. 135, 147-48 (1994) ("[W]e do not resort to legislative history to cloud a statutory text that is clear.").

The plaintiff also argues that deference is due to the Attorney General's regulations implementing Title II, which contemplate employment discrimination claims. See 28 C.F.R. § 35.140(a) ("No qualified individual with a disability shall, on the basis of disability, be subjected to discrimination in employment under any service, program, or activity conducted by a public entity."). But the Supreme Court has directed that before deferring to an agency's regulations, a court must first employ "'traditional tools of statutory construction' to determine whether Congress has expressed its intent unambiguously on the question before the court." Zimmerman, 170 F.3d at 1173 (quoting Chevron, 467 U.S. at 843 n.9). "If the intent of Congress is

_____

[12] We need not, and do not, decide here whether a Title II claim may be brought against a public employer employing fewer than fifteen employees inasmuch as the Library has represented that it has fifteen or more.

54

clear, that is the end of the matter; for the court, as well as the agency, must give effect to the unambiguously expressed intent of Congress."  Chevron, 467 U.S. at 842-43.  "The judiciary is the final authority on issues of statutory construction and must reject administrative constructions which are contrary to clear congressional intent."  Id. at 843 n.9. Because we conclude that the statute is unambiguous, we do not consider the Attorney General's regulations for this purpose.

The plaintiff also argues that our prior statement in Innovative Health Systems, Inc. v. City of White Plains, 117 F.3d 37 (2d Cir. 1997), recognized as superseded on other grounds by Zervos v. Verizon New York, Inc., 252 F.3d 163, 171 n.7 (2d Cir. 2001), that the word "discrimination" in Title II is a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context," id. at 45, establishes that we have already decided that Title II applies to employment.  But, in relevant part, Innovative only addressed (and rejected) White Plains' argument that Title II did not apply to its zoning decisions because "it contend[ed] that zoning does not constitute a 'service, program, or activity.'"  Id. at 44.  The question of whether Title II applies to employment discrimination was not before the Court.

And this statement must be considered in context. Title II provides that "no qualified individual with a disability shall, by reason of such disability, be excluded from participation in or be denied the benefits of the services,

55

programs, or activities of a public entity, or be subjected to discrimination by any such entity."  42 U.S.C. § 12132.  The Innovative court first rejected White Plains' argument on the ground that the word "activity" in the above quoted statutory text was broad enough to encompass municipal zoning decisions. 117 F.3d at 44.  This reasoning was sufficient to reject completely White Plains' argument, and would have been sufficient to decide the issue before the Court.  But the Innovative Court then offered an alternative rationale for rejecting White Plains' argument: that the statutory language "or be subjected to discrimination by any such entity," 42 U.S.C. § 12132, was a "catch-all phrase that prohibits all discrimination by a public entity, regardless of the context," 117 F.3d at 45.  In any event, then, the statement in Innovative "was not essential to the Court's holding because it was offered in the alternative[,] and therefore it is [a] dictum that is not binding on us." Willis Mgmt. (VT.), Ltd. v. United States, 652 F.3d 236, 243 (2d Cir. 2011).

For the foregoing reasons, we affirm the district court's dismissal of the plaintiff's Title II claims against the Library.[13]

---

[13] After dismissing the plaintiff's Title II claim against the Library, the district court observed that "Plaintiff does not seek leave to amend her complaint to assert a Title I ADA claim, nor refute the Library's contention that she cannot state a valid Title I ADA claim because she failed to exhaust her administrative remedies with respect to any such claim as required by 42 U.S.C. § 12117(a)."  Mary Jo C., 2011 WL 1748572, at *12 n.11, 2011 U.S. Dist. LEXIS 49567, at *39 n.11.  We do not

**CONCLUSION**

For the foregoing reasons, the district court's judgment of dismissal is vacated as to the plaintiff's Title II claim against the NYSLRS.  The case is remanded with instructions to the district court to grant the plaintiff leave to amend her complaint if she so wishes to allege facts supporting her claim that she was disabled, and to attempt to state a claim invoking the rule of Ex parte Young, 209 U.S. 123 (1908), and for further proceedings consistent with this opinion.  The district court's judgment of dismissal is affirmed as to the plaintiff's Title II claim against the Library.  The district court's decision to decline to exercise supplemental jurisdiction over the plaintiff's state law claims is vacated for reconsideration depending on the course of the further proceedings contemplated by this opinion.

Costs of the plaintiff on appeal to be paid by NYSLRS to the plaintiff; the Library shall bear its own costs.

---

express or mean to imply any opinion on our part as to whether the plaintiff should be allowed to amend her claims against the Library on remand.