Williams v. Marinelli

**UNITED STATES COURT OF APPEALS**
**FOR THE SECOND CIRCUIT**

August Term, 2019

(Argued: October 4, 2019         Decided: February 4, 2021)

Docket No. 18-1263

_____

RASHAD WILLIAMS,

*Plaintiff-Appellee,*

v.

DENNIS MARINELLI, individually and in his official capacity,

*Defendant-Appellant,*

*and*

PETER MURPHY, individually and in their official capacity; QUIROS, individually and in their official capacity; CAHILL, individually and in their official capacity; POWERS, individually and in their official capacity; BUTKIEWICUS, individually and in their official capacity; MELVIN SAYLOR, individually and in their official capacity; UCONN CORRECTIONAL MANAGED HEALTH CARE; ALPHONSO LINDSEY, individually and in their official capacity; ROBINSON, individually and in their official capacity; FRAN, DOCTOR, individually and in their official capacity; REDDING, individually and in their official capacity; JILL DOE, individually and in their official capacity; MIKE DOE, individually and in their official capacity; JILL HAGA, individually and in their official capacity; PAUL WILBUR, individually and in their official capacity,

*Defendants.*<sup></sup>

_____

Before:

LEVAL and CARNEY, *Circuit Judges*, and STANCEU, *Judge.*<sup></sup>

Defendant, former Connecticut corrections officer Dennis Marinelli, appeals from post-judgment rulings of the United States District Court for the District of Connecticut (Michael P. Shea, *J.*), concluding that an award of compensatory and punitive damages against Marinelli in favor of Plaintiff prisoner Rashad Williams on § 1983 claims remains unsatisfied notwithstanding the State of Connecticut's voluntary undertaking to pay the judgment, paying more than half of the amount of the judgment to itself, or its agencies, to satisfy state statutory debts owed by the Plaintiff to Connecticut, primarily for the cost of his incarceration. AFFIRMED.

> J. TYLER BUTTS (Linda L. Morkan, *on the brief*), Robinson & Cole LLP, Hartford, CT, *for Plaintiff-Appellee.*
>
> TERRENCE M. O'NEILL, Assistant Attorney General, *for* William Tong, Attorney General of the State of Connecticut, Hartford, CT, *for Defendant-Appellant.*

* The Clerk of Court is directed to amend the caption as set forth above.
** Chief Judge Timothy C. Stanceu, United States Court of International Trade, sitting by designation.

LEVAL, *Circuit Judge*:

Defendant, former Connecticut corrections officer Dennis Marinelli, appeals from post-judgment rulings of the United States District Court for the District of Connecticut (Michael P. Shea, *J.*), concluding that an award of compensatory and punitive damages against Marinelli in favor of Plaintiff prisoner Rashad Williams remains unsatisfied notwithstanding the State of Connecticut's voluntary undertaking to pay the judgment, paying more than half of the judgment to itself, or its agencies, to satisfy debts owed by the Plaintiff to Connecticut, primarily for the cost of his incarceration.

Williams, a Connecticut inmate, brought this suit under 42 U.S.C. § 1983 against Marinelli and other Connecticut state officials, alleging deprivation of his Eighth Amendment rights. The jury found Marinelli liable for violating Williams's constitutional rights and awarded Williams compensatory and punitive damages. Following post-verdict motions, Williams obtained an amended judgment against Marinelli in the amount of $300,000, consisting of $250,000 in compensatory damages and $50,000 in punitive damages.

The present dispute concerns the satisfaction of Williams's judgment. After the judgment became final, the State of Connecticut, having no statutory or legal obligation to do so, voluntarily undertook to satisfy the judgment on Marinelli's behalf. In doing so, the State took several actions against Williams under Connecticut law to recoup portions of its payment: (1) the State paid nearly half of Williams's $300,000 judgment to the State's own Department of Administrative Services, pursuant to a Connecticut statute granting the State a lien on part of the proceeds of an inmate's civil action to pay part of the inmate's costs of incarceration;[1] (2) after depositing a check for the remainder of the judgment into Williams's inmate trust account, the State sued Williams in state court for reimbursement of "at least $48,843.42" in costs for public defender services rendered to Williams, pursuant to a state statute permitting such a suit; and (3) the State froze $65,000 in Williams's inmate trust account

---

[1] The State also paid $15,140 of Williams's judgment to the mother of Williams's child, in satisfaction of a statutory child support lien. The parties agree that this sum should be credited towards the satisfaction of the judgment.

to secure payment for those public defender costs. Through its actions, the State recouped or sought to recoup more than 60% of Williams's judgment.[2]

Williams then filed a "motion in aid of judgment" and a "motion to unfreeze assets," seeking, *inter alia*, a ruling declaring that the State's actions were preempted by § 1983 and that the damages award against Marinelli therefore remained unsatisfied. The district court found that the collective impact of the State's actions was "virtually to nullify Williams's judgment, leaving it with little deterrent or compensatory value." App'x at 80. The court concluded that the State's actions so undermined the purposes and objectives of Congress in enacting § 1983 that they were preempted and were therefore without legal effect with respect to Williams's judgment. The court determined that Marinelli remained liable for the full amount of the judgment, reduced by $15,140 that the State paid to the mother of Williams's child as child support he owed.

---

[2] The precise amount of the State's potential recoupment is impossible to ascertain at this time, as Marinelli asserts that the amount of recoverable public defender costs "continues to rise due to ongoing habeas proceedings." Appellant's Br. 10. Moreover, the State's initial calculation of $48,843.42, as its recoverable public defender costs, did not include expert costs, which the State has reserved the right to seek.

Marinelli subsequently filed a "motion for credit against judgment," arguing that some or all of the money paid to Williams by the State should be credited towards Marinelli's satisfaction of the judgment. The district court granted Marinelli's motion with respect to $16,800 of the State's payment that Williams had already spent but denied the remainder of Marinelli's requested credits.

On appeal, Marinelli contends principally that the district court erred in finding the State's actions preempted by § 1983. For the reasons below, we affirm the rulings of the district court.

## I.    BACKGROUND

**A. Factual Background[3]**

Williams is currently serving a 30-year sentence as an inmate in the custody of the Connecticut State Department of Correction (DOC). In 2010, Williams was incarcerated at Northern Correctional Institution ("Northern"). Marinelli was a captain at Northern and helped oversee the Administrative

---

[3] The underlying facts are not in dispute for the purposes of this appeal. The following summary of the facts giving rise to Williams's § 1983 claim is taken primarily from the district court's ruling on the parties' post-verdict motions. *See* App'x at 9–18.

Segregation Program, a restrictive housing program to which Williams was assigned during the relevant period.

In early 2010, Williams conveyed to officials at Northern that he feared for his safety, particularly in the event he was placed in a cell with a gang member. He was afraid that, in such a circumstance, he would be unable to defend himself from an assault due to what the district court termed the "sequential uncuffing" practice at Northern. Under that practice, upon returning prisoners to a shared cell, prison staff remove the prisoners' handcuffs seriatim through a hole in the cell door only after the prisoners are securely locked in the cell, so that one prisoner remains cuffed and defenselessly exposed to the risk of violence from the other, previously uncuffed, prisoner. Williams expressed concern that this practice would expose him to assault by a cellmate, particularly if he were made to share a cell with a gang member. Although Williams had been living without a cellmate since his arrival at Northern, he feared that he would be placed with a cellmate as he progressed through the Administrative Segregation Program. From May to October 2010, Williams repeatedly conveyed these concerns to

mental health professionals at Northern, who assured him that he would continue living alone.

On October 28, 2010, Northern officials informed Williams that he would be placed in a cell with Darnell Walker, an active member of the Bloods. Walker had been designated a security risk based on his past acts of violence in prison. Marinelli was involved in the decision to move Williams, would have been informed if Williams was on "single cell" status, and would have reviewed Walker's security risk designation and disciplinary history prior to the move. Upon learning of the planned move, Williams protested that he had been assured he would remain on "single cell" status, and urged prison officials to contact Northern's mental health staff to confirm. The officers brought the issue to Marinelli, who instructed the officers to return Williams to the cell with Walker and indicated that Williams would be issued a disciplinary report if he refused to comply.

Williams was escorted back to the cell with his hands cuffed behind his back. Before opening the door, the officers cuffed Walker through the hole in the cell door. Williams then entered the cell. Once the door was closed, the officers then uncuffed Walker, per the "sequential uncuffing" procedure

8

described above. Once Walker was uncuffed, he assaulted Williams, whose hands remained cuffed behind his back. Walker punched the defenseless Williams in the head, knocked him to the floor, kicked him, and stomped on him. Because the cell door was operated by the control room down the hall, the officers could not immediately intervene. Williams suffered injuries to his head, ankle, back, and knee, as well as anxiety and recurring nightmares, as a result of the attack.

Following the assault, Marinelli repeatedly threatened to assign Williams another cellmate. After the Northern deputy warden instructed Marinelli not to place Williams in a cell with another inmate, Marinelli continued to tell Williams that he would receive a cellmate, and attempted to persuade mental health staff at Northern to remove Williams from the "single cell" list.

**B. Procedural History**

In 2013, Williams filed this § 1983 action against Marinelli (as well as other Connecticut prison officials), alleging deliberate indifference to unsafe conditions in violation of Williams's rights under the Eighth and Fourteenth Amendments of the United States Constitution. The case proceeded to a jury

trial with respect to four individual defendants, including Marinelli.[4] The court instructed the jury that it could award punitive damages against a defendant if it found that the defendant had engaged in either "[m]alicious or oppressive violation of Mr. Williams's constitutional rights" or "[r]eckless disregard or callous indifference as to whether [the defendant] was violating Mr. Williams's constitutional rights." App'x at 84–85. The jury rendered a verdict in favor of Williams against Marinelli, awarding $250,000 in compensatory damages and $400,000 in punitive damages.[5] With respect to the punitive damage award, the jury answered "Yes" to the question "[D]o you choose to award punitive damages against [Marinelli] in order to punish or deter similar conduct?" Dkt. No. 176, at 2–3.[6]

The parties filed post-verdict motions. The district court denied both parties' motions for judgment as matter of law, as well as Marinelli's motion for a new trial. However, it granted in part Marinelli's motion for remittitur, ordering a new trial on damages if Williams did not accept a reduced award

---

[4] By the time of the trial, Marinelli had retired from DOC and was no longer a State employee.

[5] The jury found the other three defendants not liable.

[6] "Dkt. No." refers to docket entries for the proceedings below. *See Williams v. Murphy*, No. 3:13-cv-01154 (MPS) (D. Conn. 2017).

10

of $300,000 (consisting of $250,000 in compensatory damages and $50,000 in punitive damages).[7] Williams accepted the remittitur and obtained an amended judgment in the amount of $300,000.

Marinelli initially appealed from the amended judgment, but later withdrew the appeal. After Marinelli withdrew his appeal, the Assistant Attorney General who had defended Marinelli at trial informed Williams's attorney by email that the State would pay the judgment on Marinelli's behalf, making payments as follows: (1) $15,140 to Connecticut Child Support in fulfillment of Williams's statutory obligation under a child support lien;[8] (2) $142,430 to the Connecticut Department of Administrative Services in partial fulfillment of Williams's statutory obligation to reimburse Connecticut for the cost of his incarceration; and (3) $142,430 to Williams. The State sent a check for $142,430 to DOC to be deposited into Williams's inmate trust

---

[7] Williams had also filed a post-verdict motion to enjoin the State from imposing a cost-of-incarceration lien on his award. Because Marinelli was at that point still entitled to appeal the judgment on the merits, the district court denied Williams's motion as unripe, "without prejudice to his refiling the motion when issues arising from collection of the judgment become ripe." App'x at 64.

[8] The State later represented to the district court that this $15,140 sum was paid to the mother of Williams's child, not the State or any agency thereof.

account, asserting that this represented "payment in full" of Williams's judgment. Dkt. No. 241-2, at 2.

In response, Williams filed a "motion for aid of judgment," seeking, *inter alia*, a ruling that the damages award against Marinelli remained unsatisfied, notwithstanding Connecticut's payments described above. In particular, Williams sought the district court's declaration that Connecticut's cost of incarceration lien statute, Conn. Gen. Stat. § 18-85b, at least as the State had applied it to these facts, was preempted by § 1983. Williams agreed that the State's payment of $15,140 to the mother of his child pursuant to a child support lien should be counted towards the satisfaction of the judgment. At the court's invitation, the State filed a "response" arguing that the Eleventh Amendment barred the relief sought by Williams, and that in any event its actions were not preempted.

While Williams's motion was pending, on October 16, 2017, the State ordered a freeze on $65,000 in Williams's inmate trust account. Approximately a month later, the State filed a lawsuit against Williams in state court, seeking recovery of "at least $48,843.42" that it had paid to the Connecticut Division of Public Defender Services for legal services rendered

12

to Williams.[9] Williams filed a "motion to unfreeze assets," arguing that the State's actions with respect to the public defender costs "suffer[ed] from the same constitutional defect as the State's cost of incarceration claim."[10] Dkt. No. 257, at 3.

The district court granted in part and denied in part Williams's "motion for aid of judgment" and denied his "motion to unfreeze assets." On the question of preemption, the court found that the combined effect of the State's actions — its voluntary indemnification of Marinelli and its attempt to recoup more than half of Williams's judgment — was "virtually to nullify [the] judgment, leaving it with little deterrent or compensatory value and thereby undermining Congress's purposes in enacting Section 1983." App'x at 80. The State's actions, the court reasoned, sent to its DOC employees the message

[9] It is undisputed that the purpose of the $65,000 hold is to facilitate the State's recovery of the public defender costs. The State subsequently explained that it reserved the right to seek additional funds beyond the $48,843.42, on account of funds expended by the Division of Public Defender Services for expert witnesses not included in the original sum sought, and perhaps also on account of further public defender services that might be rendered to Williams.
[10] Williams also removed the state-court action to federal court, where it was assigned to Judge Shea. On the same day that the district court ruled on Williams's motions for aid of judgment and to unfreeze assets, it also ruled that it lacked removal jurisdiction over the state-court action, and remanded the action to the Connecticut Superior Court.

13

that "even when they maliciously violate an inmate's civil rights, neither they nor their employer will suffer significant financial consequences." *Id.* Finding that such a result "starkly clash[ed]" with Congress's purposes in enacting § 1983, the court concluded that the State's actions were preempted. *Id.* The court made clear that its ruling was "limited to the peculiar facts of this case," which involved the voluntary indemnification of a former employee "found to have committed malicious or reckless conduct," followed by attempted recoupment of most of the judgment. *Id.* at 106. It "d[id] not hold that the State may never use the cost recovery statutes at issue in this case to reduce a Section 1983 award." *Id.* at 109.

The court next considered what relief was available under the Eleventh Amendment. It concluded that, while the Eleventh Amendment would prohibit the court from ordering the State to pay Williams the remainder of the judgment or vacating the freeze on assets in Williams's inmate trust account, the Amendment did not prohibit the court from ruling that Connecticut's attempt to discharge the judgment against Marinelli was preempted by § 1983, and therefore failed to satisfy Marinelli's obligation to

14

pay the damages award.[11] The court concluded that $287,433.92 of the judgment against Marinelli remained outstanding.[12]

Marinelli then filed his "motion for credit against judgment," requesting that he be credited with the entire balance of the judgment by reason of the State's payments. The district court granted Marinelli's motion to the extent of $16,800 which Williams had received in his inmate trust account and had spent. This credit was in addition to the $15,140 child support payment that the court had already credited to Marinelli. The court otherwise denied Marinelli's motion, calculating Marinelli's remaining liability to be $270,983.72.

---

[11] The court did not at first explain in its ruling why the unfrozen portion of the money paid by the State into Williams's inmate account should not count towards satisfaction of the judgment. The court, at a later time, explained that while the $65,000 initially frozen by the State represented only approximately half of the State's payment into Williams's inmate trust account, the State remained apparently capable at will of freezing the entirety of the account in connection with its efforts to collect debts from Williams. The court concluded that money allegedly available in Williams's inmate account should not be credited to Marinelli until Williams exercised "dominion and control" over that money. App'x at 176.

[12] The court credited to Marinelli the $15,140 paid by the State to the custodial parent of Williams's child in satisfaction of a child support lien. *See* Notes 1 & 8, *supra*. Marinelli moved for reconsideration of the district court's ruling, which the court denied.

Marinelli appeals from the district court's rulings on Williams's "motion for aid of judgment" and "motion to unfreeze assets," Marinelli's motion for reconsideration, and Marinelli's "motion for credit against judgment."

## II. DISCUSSION

**A. Eleventh Amendment**

Marinelli contends that the declaratory relief granted by the district court was barred by the Eleventh Amendment. The presentation of this argument in Marinelli's brief, scanty at best, says no more than that the trial court's ruling — which it describes as issued under the "*Ex parte Young* exception to the Eleventh Amendment," Appellant's Br. 13 — was "clearly barred by the Eleventh Amendment," and that "[n]o exception to Eleventh Amendment immunity applies to lift the bar," *id.* at 16. Williams argues that Marinelli's Eleventh Amendment challenge is therefore waived due to insufficient briefing. Although these conclusory utterances might not suffice to preserve other issues for appellate review, we nonetheless must consider the Eleventh Amendment issue here because, if the relief sought by Williams would violate the Amendment, we would lack the power to grant it. *See, e.g.,*

*Atlantic Healthcare Benefits Tr. v. Googins*, 2 F.3d 1, 4 (2d Cir. 1993) (raising Eleventh Amendment immunity *sua sponte* "because it affects our subject matter jurisdiction"); *cf. Mansfield, C. & L.M. Ry. Co. v. Swan*, 111 U.S. 379, 382 (1884) ("[T]he rule . . . is inflexible and without exception which requires this court, of its own motion, to deny its own jurisdiction, and, in the exercise of its appellate power, that of all other courts of the United States, in all cases where such jurisdiction does not affirmatively appear on the record . . . .").

"[A]bsent waiver by the State or valid congressional override, the Eleventh Amendment bars a damages action against a State in federal court." *Kentucky v. Graham*, 473 U.S. 159, 169 (1985). This rule of immunity extends to cases where "the action is in essence one for the recovery of money from the state," even when individual officials are the nominal defendants. *Ford Motor Co. v. Dep't of Treasury*, 323 U.S. 459, 464 (1945), *overruled on other grounds by Lapides v. Bd. of Regents of the Univ. Sys. of Ga.*, 535 U.S. 613 (2002); *accord Edelman v. Jordan*, 415 U.S. 651, 662–71 (1974) ("[The relief at issue] is in practical effect indistinguishable in many aspects from an award of damages against the State. It will to a virtual certainty be paid from state funds, and not from the pockets of the individual state officials . . . ."). Similarly, the Eleventh

Amendment bars declaratory relief that would have the same effect as an award of damages against the state. *Green v. Mansour*, 474 U.S. 64, 73 (1985).

As discussed above, the relief granted by the district court in this case consisted of a declaration that the State's actions in purported satisfaction of Williams's judgment against Marinelli were preempted by § 1983, and that Marinelli therefore remained liable for the bulk of the judgment. The relief took nothing from the State of Connecticut; it was directed at Marinelli, sued in his individual capacity in this § 1983 action. The Eleventh Amendment does not bar a federal court from granting monetary relief against such a defendant. *See Hafer v. Melo*, 502 U.S. 21, 31 (1991) ("We hold that state officials, sued in their individual capacities, are 'persons' within the meaning of § 1983. The Eleventh Amendment does not bar such suits . . . .").

The district court carefully refrained from granting Williams's requests for various forms of monetary relief from the State, including orders that the State pay the remainder of his judgment and that the State unfreeze the assets in his inmate trust account. Nor would the declaratory relief granted by the district court operate in effect as a damages award against the State. As the State acknowledged below, its decision to indemnify Marinelli was

"discretionary." Dkt. No. 268, at 8. Marinelli has made no showing that the State is under any obligation to contribute at all to the payment of Marinelli's remaining liability under the judgment. We see no reason why the Eleventh Amendment would bar the district court's ruling that Marinelli's debt to Williams has not been satisfied.[13]

---

[13] Marinelli's assertion that the district court's ruling depended on the exception to Eleventh Amendment immunity established by *Ex parte Young*, 209 U.S. 123 (1908), is misguided. As the district court correctly noted in its ruling on Marinelli's motion for reconsideration, *Ex parte Young* was not the basis for its ruling that the judgment remained unsatisfied.

Ordinarily, a suit against a state official in her official capacity is deemed an action against the state itself, and Eleventh Amendment immunity applies. *See Libertarian Party of Erie Cnty. v. Cuomo*, 970 F.3d 106, 122–23 (2d Cir. 2020). However, under the *Ex parte Young* exception, the Eleventh Amendment does not bar a suit for "prospective relief against an individual acting in his official capacity . . . to end an ongoing violation of a federal law." *Vega v. Semple*, 963 F.3d 259, 281 (2d Cir. 2020); *see also Ex parte Young*, 209 U.S. at 160.

Here, the district court's ruling did not purport to order the State, or any State official acting in her official capacity, to do anything or refrain from doing anything. Nor did it declare the rights or obligations of the State (or a State official acting in official capacity) vis-à-vis Williams. Rather, it merely ruled that certain of the State's actions had no effect on the obligations of Marinelli, a former state official who was sued in his individual capacity and thus not protected by Eleventh Amendment immunity. *See Hafer v. Melo*, 502 U.S. at 31. The court had no need to rely on *Ex parte Young* to rule that the judgment against Marinelli remained unsatisfied.

**B. Preemption**

Marinelli contends that the district court erred in concluding that Connecticut's actions were preempted by 42 U.S.C. § 1983. "We review *de novo* a district court's application of preemption principles." *New York SMSA Ltd. P'ship v. Town of Clarkstown*, 612 F.3d 97, 103 (2d Cir. 2010) (per curiam) ("*SMSA*").

The doctrine of federal preemption provides that "[u]nder the Supremacy Clause of the Constitution, state and local laws that conflict with federal law are without effect." *Id.* at 103–04 (internal quotation marks omitted). Although preemption often applies to state statutes, preemption can also invalidate actions of state executive branch officials and state courts that conflict with federal law. *See Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 383–84, 391 (1992) (holding that Airline Deregulation Act preempted use of state's general consumer protection laws to bring enforcement actions "having a connection with or reference to airline 'rates, routes, or services'"); *Mississippi Power & Light Co. v. Mississippi ex rel. Moore*, 487 U.S. 354, 357, 370 (1988) (holding that FERC order requiring power company to purchase portion of nuclear plant's output at rate deemed by FERC to be just and

20

reasonable preempted state agency proceedings to determine whether expenses associated with construction of plant were prudently incurred).

We have said that "[i]n general, three types of preemption exist: (1) express preemption, where Congress has expressly preempted local law; (2) field preemption, where Congress has legislated so comprehensively that federal law occupies an entire field of regulation and leaves no room for state law; and (3) conflict preemption, where local law conflicts with federal law such that it is impossible for a party to comply with both or the local law is an obstacle to the achievement of federal objectives." *SMSA*, 612 F.3d at 104 (internal quotation marks omitted). When state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), this form of conflict preemption is sometimes described as obstacle preemption.

"In all pre-emption cases . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996) (quoting *Rice v. Santa Fe Elevator Corp.*, 331

U.S. 218, 230 (1947)). "[T]he purpose of Congress is the ultimate touchstone in every pre-emption case." *Id.* (internal quotation marks omitted).

In order to establish obstacle preemption, the party asserting preemption must show more than the "mere fact of tension between federal and state law." *Madeira v. Affordable Hous. Found., Inc.*, 469 F.3d 219, 241 (2d Cir. 2006) (internal quotation marks omitted). Rather, there must be a "sharp" conflict between state law and federal policy. *Marsh v. Rosenbloom*, 499 F.3d 165, 178 (2d Cir. 2007). "[F]ederal law does not preempt state law under obstacle preemption analysis unless the repugnance or conflict is so direct and positive that the two acts cannot be reconciled or consistently stand together." *In re Methyl Tertiary Butyl Ether (MTBE) Prods. Liab. Litig.*, 725 F.3d 65, 102 (2d Cir. 2013) ("*MTBE*") (internal quotation marks omitted).

"What constitutes a 'sufficient obstacle' is 'a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects.'" *Id.* at 101 (quoting *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 162 (2d Cir. 2013)).

22

### 1. The State Statutory Backdrop

A number of Connecticut statutes underlie or otherwise inform the State's actions with respect to Williams's judgment.

Conn. Gen. Stat. § 18-85a provides that the State of Connecticut "shall have a claim against each inmate for the costs of such inmate's incarceration under this section, and regulations adopted in accordance with this section, for which the state has not been reimbursed." Conn. Gen. Stat. § 18-85a(b). "In addition to other remedies available at law, the Attorney General . . . may bring an action in the superior court for the judicial district of Hartford to enforce such claim." *Id.* Such action of the Attorney General must generally be brought within two years of the date the inmate is released from incarceration. *Id.* Connecticut state court precedent establishes that the State may bring an action for costs of incarceration while the inmate is still imprisoned. *See State v. Ham*, 253 Conn. 566, 568–69 & n.4 (2000) (per curiam) (considering action under section 18-85a against incarcerated defendant). Under regulations promulgated by the Commissioner of Corrections under section 18-85a, "inmate" refers to any "individual confined, or formerly confined, in a correctional facility serving a sentence imposed by any

23

Connecticut state court." Conn. Agencies Regs. § 18-85a-1(b). The regulations also establish the method for calculating the costs of incarceration. *Id.* §§ 18-85a-1(a), 18-85a-2. According to Marinelli, under the current regulatory rate, Williams's total costs of incarceration for his 30-year sentence will equal $1,818,393.

Conn. Gen. Stat. § 18-85b provides that, for twenty years following a Connecticut inmate's release from incarceration, for any causes of action brought by such inmate, the claim of the state for recovery of the cost of the inmate's incarceration "shall be a lien against [funds recovered by the inmate in such action] in the amount of the costs of incarceration or fifty per cent of the proceeds received by such person after payment of all expenses connected with the cause of action, whichever is less." Conn. Gen. Stat. § 18-85b(a). "The proceeds of such causes of action shall be assignable to the state for payment of the amount due under section 18-85a . . . ." *Id.*

Additionally, under Conn. Gen. Stat. § 51-298(b), the Connecticut Public Defender Services Commission

> shall have a claim against any person represented by a public defender . . . for the reasonable value of services rendered to him, as determined in accordance with the schedule of reasonable charges for public defender services provided by the commission. The claim shall be

enforceable by civil action brought in the name of the state on behalf of the commission by the Attorney General, at any time within ten years from the last date on which any services were rendered. Money so recovered shall be repaid to the commission.

Finally, in certain instances, the State is required to indemnify a state employee for any loss arising out of a claim against the employee acting within the scope of his employment: "The state shall save harmless and indemnify any state officer or employee . . . from financial loss and expense arising out of any claim . . . by reason of his alleged negligence or alleged deprivation of any person's civil rights or other act or omission resulting in damage or injury, if the officer . . . is found to have been acting in the discharge of his duties or within the scope of his employment and such act or omission is found not to have been wanton, reckless or malicious." Conn. Gen. Stat. § 5-141d(a). In this case, however, in which Marinelli was subjected to punitive damages based on a jury finding that his conduct was "malicious" or "reckless," Marinelli does not contend that the statutory obligation of Connecticut to indemnify a state officer applies to him, and the district court operated under the assumption that the State was under no obligation to indemnify Marinelli under § 5-141d(a). Marinelli does not contest this point on appeal.

## 2. The Purposes and Objectives of § 1983

To determine whether the State's actions create a sufficient obstacle to the purposes and objectives of a federal law, we must determine what those purposes and objectives are. *See Hillman v. Maretta*, 569 U.S. 483, 491 (2013); *MTBE*, 725 F.3d at 102. With regard to § 1983, those purposes are well established.

As the Supreme Court has observed, Congress's intent in enacting § 1983 "was to interpose the federal courts between the States and the people, as guardians of the people's federal rights — to protect the people from unconstitutional action under color of state law, 'whether that action be executive, legislative, or judicial.'" *Mitchum v. Foster*, 407 U.S. 225, 242 (1972) (quoting *Ex parte Virginia*, 100 U.S. 339, 346 (1879)). Proponents of the legislation believed it necessary to provide effective protection to citizens' federal rights. One such supporter, for instance, stated:

> [The] records of the [state] tribunals are searched in vain for evidence of effective redress [of federally secured rights]. . . . The Federal Government cannot serve a writ of mandamus upon State Executives or upon State courts to compel them to protect the rights, privileges and immunities of citizens . . . . The case has arisen . . . when the Federal Government must resort to its own agencies to carry its own authority into execution. Hence this bill throws open the doors of the

United States courts to those whose rights under the Constitution are denied or impaired.

*Id.* at 240 (internal quotation marks omitted) (quoting Cong. Globe, 42d Cong., 1st Sess., 374–76 (1871) (remarks of Representative David Lowe)). In other words, the legislation provided a federal remedy to counteract the perceived failure of the states to provide effective redress for violations of federal rights.

The "chief goals" of § 1983 are to provide compensation for violations of federal rights, and to deter such violations. *Hardin v. Straub*, 490 U.S. 536, 539 (1989); *see also Wyatt v. Cole*, 504 U.S. 158, 161 (1992) ("The purpose of § 1983 is to deter state actors from using the badge of their authority to deprive individuals of their federally guaranteed rights and to provide relief to victims if such deterrence fails."); *Owen v. City of Independence*, 445 U.S. 622, 651 (1980) ("§ 1983 was intended not only to provide compensation to the victims of past abuses, but to serve as a deterrent against future constitutional deprivations, as well.").

### 3. The Effects of the State's Actions on the Objectives of § 1983

Marinelli contends that the district court erred in concluding that § 1983 preempted Connecticut's satisfaction of Marinelli's judgment obligations by

27

making payments largely to itself in reliance on its statutes. We disagree.

Upon consideration of all the facts of this unusual case, we conclude that Connecticut's actions conflict irreconcilably with § 1983's purpose of deterring constitutional violations. The deterrent effect of Williams's § 1983 award is eviscerated if both the constitutional tortfeasor and his employer, the State, are relieved of the bulk of the financial consequences of the violation. We conclude that the State's actions here conflict sufficiently sharply with § 1983's goals, particularly the goal of deterring state officers from abusing prisoners in their charge in violation of their constitutional rights, to justify the district court's conclusion that the State's attempt to discharge Marinelli's judgment obligations while recouping more than half the judgment through its cost-recovery statutes is preempted by § 1983, and the judgment against Marinelli remains outstanding.

Our holding is very much dependent on the facts of this case. It is not a broad holding that would prevent the normal operation of the Connecticut statutes in question. Our ruling is based on the following factors: (1) the jury's finding that Marinelli engaged in malicious or reckless violation of Williams's rights and its award of punitive damages to "punish or deter similar

28

conduct," Dkt. No. 176, at 2–3;[14] (2) the seriousness of the injuries suffered by Williams resulting from Marinelli's malicious or reckless conduct; (3) the State's voluntary undertaking to pay Marinelli's judgment obligations (the State's undertaking to indemnify Marinelli in the face of his malicious or reckless harmful conduct substantially undermines the deterrent effect that the risk of personal liability otherwise would have on a state official);[15] (4) the fact that the State's recoupment would deprive Williams of at least 60% of his judgment; (5) the length of Williams's sentence, which ensures that the cost of his incarceration will be high, and thus informs corrections officers from the day of his imprisonment that the risk of suit against them is diminished by the likelihood that any recovery achieved by the prisoner can be very substantially reduced by the State's cost recovery; and (6) the fact that the

---

[14] As courts have recognized, punitive damages are "aimed . . . principally at retribution and deterring harmful conduct," rather than compensating the victim. *Exxon Shipping Co. v. Baker*, 554 U.S. 471, 492 (2008).

[15] Because Marinelli, having been found liable for a malicious or reckless violation of Williams's rights, does not contend that Connecticut was required to indemnify him under Conn. Gen. Stat. § 5-141d, *see supra*, we have no occasion to opine on whether the preemption analysis would be different had the State been required under state law to pay the judgment. We note, however, that if the State's payment of Marinelli's obligations had been pursuant to a state-law requirement, rather than a voluntary decision, the financial impact of those actions would remain unchanged.

cost-of-incarceration and public defender debts at issue here, unlike other debts that may give rise to liens on § 1983 recoveries, apply broadly to a significant portion of the inmate population (or, in the case of the cost of incarceration statutes, apparently all of that population), making it easier for officials to know *ex ante* that prisoners' civil recoveries will likely be reduced by operation of the Connecticut cost-recovery statutes.

Marinelli advances a number of arguments against our conclusion. We find them unpersuasive. First, he argues that § 1983's goals of compensation and deterrence are not without limits, pointing to the existence of various immunity doctrines that shield officials from § 1983 liability (doctrines which, Marinelli points out, Congress has not sought to limit or eliminate), as well as various restrictions imposed by Congress on prisoner lawsuits in the PLRA. We recognize that, as these examples suggest, the goals of compensation and deterrence are not absolute, and they may occasionally give way to competing policy interests. The existence of these limitations on § 1983 suits, however, has little bearing on whether the State's actions are preempted in this case, where the Plaintiff has successfully obtained a judgment despite those limitations. The rationale for the district court's finding of preemption

30

was not that § 1983's goals of compensation and deterrence are absolute and must never give way to other interests, but rather that the State's actions in this case conflicted so sharply with those goals that they were preempted. It is perfectly consistent to acknowledge that plaintiffs' ability to recover under § 1983 is limited in certain circumstances, on the one hand, and, on the other, to find that state-law actions with respect to a § 1983 judgment obtained despite those limitations are preempted when they conflict with § 1983's purposes.

Second, Marinelli argues that Congress tacitly approved of state lien statutes like Conn. Gen. Stat. § 18-85b by enacting the PLRA against the backdrop of the "wide prevalence" of such statutes. Appellant's Br. 30. Congress's curtailing of prisoner § 1983 litigation in the PLRA, Marinelli asserts, "suggests it undertook an active and careful examination of the use of § 1983 to address areas that it deemed problematic," and that "[s]tate incarceration lien statutes were not one of those problem areas." *Id.* Moreover, Marinelli cites to a report indicating that, prior to the enactment of the PLRA, thirty-six states had statutes imposing costs of incarceration on inmates. However, as Marinelli's counsel admitted at oral argument, he was aware of

31

no evidence that Congress has considered state collection statutes in the context of § 1983. In the absence of any such evidence, we do not interpret Congress's silence to mean that it intended to permit states to use such statutes in ways that sharply conflict with the purposes of § 1983.

In any event, our finding of preemption is based on the combined effect of the State's actions here, including not just the operation of the cost-of-incarceration lien but also the State's voluntary decision to pay Marinelli's obligation under the judgment, the jury's award of punitive damages pursuant to a finding that Marinelli had engaged in malicious or reckless conduct, and the State's efforts to recover public defender costs from Williams. Thus, even if we agreed with Marinelli that Congress has tacitly approved of the use of cost-of-incarceration statutes in the § 1983 context, this would not disprove that the State's actions here, *in the aggregate*, sharply conflict with § 1983's goals.

Third, Marinelli contends that the existence of a federal regulation providing for the recovery of costs of incarceration from federal inmates, 28 C.F.R. § 505.1, suggests that the State's actions do not sharply conflict with § 1983. According to Marinelli, it is "difficult to discern why Congress would

manifestly seek to preempt a state law that is virtually identical to federal prison regulations." Appellant's Br. 31. However, it is not the cost-of-incarceration statute itself that the district court declared to be preempted; it was the use of the statute, along with others, to recoup more than half of a § 1983 award including punitive damages after holding harmless the actual judgment debtor who had engaged in malicious or reckless conduct. As the district court observed, Marinelli points to no case in which the federal government has sought to recover costs of incarceration after voluntarily satisfying a federal employee's obligations to pay a judgment for a malicious or reckless violation of constitutional rights. And at oral argument, counsel for Marinelli indicated that he could not find any information about the federal government's actual practice of recovering costs of incarceration. Furthermore, the analogy Marinelli draws to the federal regulatory scheme is imperfect for several reasons: First, unlike in the case of federal preemption of state law, there is no higher sovereignty that enjoys supremacy over federal law; nor is there a federal statutory equivalent to § 1983's role in preempting the operation of the cost-recovery statutes in this circumstance. Furthermore, the existence of the federal regulatory scheme

33

does not necessarily mean that, if federal officers acted in a manner akin to Connecticut's actions in this case, those actions might not be found to conflict with the objective of the Eighth Amendment to protect federal prisoners from cruel and unusual punishment. We are not persuaded that the mere existence of a federal regulation permitting recovery of costs of incarceration weighs against a finding that the State's actions were preempted in this case.

Fourth, Marinelli argues that the effect of Connecticut's cost-recovery statutes on deterrence is uncertain or remote. Given that, under § 1983, an employee's actions cannot be imputed to the State under a theory of *respondeat superior*, Marinelli contends, "[o]nly a strained understanding of deterrence can link a state incarceration lien statute or a [public defender services] recoupment of fees statute to the individualized and unauthorized conduct of a state employee who is found to have acted in a manner contrary to established state policy and practice years before a lien is even enforced." Appellant's Br. 27. We disagree. The impact of the State's actions on § 1983's deterrence goal is plain. By voluntarily undertaking to satisfy Marinelli's obligations, the State sends the message that individual defendants will not suffer financial consequences for even malicious or reckless violations of

34

constitutional rights. Moreover, by application of the cost-recovery statutes, the State has drastically reduced its own financial loss resulting from the judgment, thereby decreasing its own incentive to take measures to prevent its employees from violating constitutional rights. In addition, the ability of the State to recoup a significant portion of any recovery will discourage inmates from bringing suit in the first place — a fact that prison officials can easily infer *ex ante*, given that apparently all Connecticut inmates are chargeable for the costs of their incarceration, *see* Conn. Agencies Regs. § 18-85a-1(b), and many are also chargeable for public defender services. As the district court noted, the combined effect of the State's actions is to severely reduce any incentive created by Williams's § 1983 judgment to refrain from even malicious constitutional violations.

Fifth, Marinelli argues that the district court's ruling ignored the significant resources spent by the State to ensure that state employees respect citizens' constitutional rights, and that "there was no finding" in this case "that the State, through its training or policies . . . caused the harm to Williams." Appellant's Br. 25–26. This argument misses the mark. The district court's finding of preemption in no way depended on a finding that the State

caused the harm, or that the State was deficient in its efforts to ensure that its employees do not violate constitutional rights. It depended simply on the conclusion that the State's actions with respect to Williams's judgment, in the circumstances of the case, sharply conflicted with the purposes of § 1983. The State is not free to interfere with the deterrent purpose of § 1983 simply because it takes independent measures to avoid constitutional violations.

Sixth, Marinelli argues that there is no conflict between the State's actions and § 1983's goal of compensation, because Williams has received compensation in the form of satisfaction of his debts. Marinelli argues that, with respect to compensation, there is no difference between applying part of the judgment to Williams's statutory debts to the State (or the Public Defender Services Commission), on the one hand, and applying part of the judgment to Williams's child support debt, which Williams agrees should be treated as compensation to him, on the other. Williams responds that, unlike satisfaction of a third-party debt, the State's attempt to reduce its own liability has the "practical effect of allowing the State to keep the money for itself." Appellee's Br. 16. He also contends that depositing money into his inmate trust account should not be considered compensation because it did not "put

36

any monies under [Williams's] sole dominion and control." Appellee's Br. 17 (quoting App'x at 105). Because we find that the State's actions so sharply conflict with § 1983's goal of deterrence that they are preempted, we express no view on the difficult question whether the State's actions conflict with § 1983's goal of compensation.

Finally, Marinelli relies on several court precedents in which district courts or our sister circuits held that the application of lien statutes or other victim or creditor remedies to § 1983 awards was not preempted by § 1983. As an initial matter, these cases are not binding on us. But in any event, in all of these cases, the impact of the state's actions on the deterrence goal of § 1983 was less substantial than the impact of Connecticut's actions in this case. None of Marinelli's cases persuade us that our finding of obstacle preemption in this case is incorrect.

First, he relies on *Bonilla v. Semple*, No. 3:15-cv-1614 (VAB), 2016 WL 4582038 (D. Conn. Sept. 1, 2016), in which the plaintiff argued that Connecticut's application of Conn. Gen. Stat. § 18-85b (the cost-of-incarceration lien) to the proceeds of the plaintiff's § 1983 settlement with three municipal police officers was preempted. 2016 WL 4582038, at *1–2. The

court rejected the plaintiff's argument, finding that the conflict between section 18-85b and § 1983 was not sufficiently sharp to warrant obstacle preemption. *Id.* at *7. Unlike the present case, however, there was no indication in *Bonilla* that the State of Connecticut paid the officers' obligations under the settlement agreement and thereby relieved the officers of the financial burden of the plaintiff's § 1983 suit. Thus, the state's recoupment did not diminish the incentive of the police officers to respect constitutional rights, if only to protect themselves from liability.

Second, Marinelli relies on *Beeks v. Hundley*, 34 F.3d 658 (8th Cir. 1994), in which the Eighth Circuit held that a state's seizure of most of an inmate's § 1983 recovery to pay victim restitution was not preempted by § 1983. With respect to deterrence, the court reasoned that victim restitution did not defeat § 1983's deterrence goal because "the money was applied to the inmates' pre-existing obligations to the victims of their crimes," and in most cases "the State [did] not ultimately receive the § 1983 proceeds." *Beeks*, 34 F.3d at 661. In *Beeks*, the state's actions reduced neither the § 1983 judgment debtor's burdens nor its own, and they therefore did not reduce the deterrent effect of the judgment in the way that Connecticut's actions did here.

Third, Marinelli relies on *Vincent v. Sitnewski*, No. 10 Civ. 3340 (TPG), 2011 WL 4552386 (S.D.N.Y. Sept. 30, 2011), which, following *Beeks*, held that a statute facilitating the recovery of part of a § 1983 judgment by a crime victim did not conflict with § 1983's deterrence purpose. 2011 WL 4552386, at *4. As the district court recognized in *Vincent*, the statute at issue "[did] not allow [New York state or its agencies] to 'recoup' funds from a convicted person on its own behalf, but rather, on behalf of individual crime victims." *Id.* at *3. Thus, like *Beeks*, *Vincent* did not contemplate a situation in which a state's actions reduce the financial impact of a § 1983 judgment on either the judgment debtor or the state itself.

Fourth, Marinelli relies on *Colondres v. Scoppetta*, 290 F. Supp. 2d 376 (E.D.N.Y. 2003), in which the plaintiff argued that the City of New York's assertion of a $4,222.26 lien on a $30,001 judgment for reimbursement of the costs of public assistance was preempted by § 1983. 290 F. Supp. 2d at 379. The court disagreed, reasoning that "[u]nlike other cases in which the amount of the lien was nearly or even exceeded the full amount of the recovery, the amount of the lien in this case is only 14% of plaintiff's . . . judgment . . . . Enabling the City to assert a lien in this case does not establish a dangerous

39

incentive for City employees to ignore the civil rights of those on public assistance." *Id.* at 384. Here, by contrast, where the State recovers more than 60% of a judgment incurred by reason of the malicious or reckless conduct of its officer, the deterrent effect on officers of the risk of liability is substantially undermined.

Finally, Marinelli relies on *Brown v. Stone*, 66 F. Supp. 2d 412 (E.D.N.Y. 1999), in which the district court rejected the plaintiffs' requests for a declaration that § 1983 preempted the New York State Office of Mental Health (OMH) from applying state statutes permitting it to recover care and treatment charges to "reach[] any sums which any patient or former patient . . . may recover against OMH or its employees in any litigation emanating from the patient's maltreatment." 66 F. Supp. 2d at 416. This court affirmed the district court's preemption finding by summary order "for substantially the reasons stated by the district court." *Mental Disability Law Clinic, Touro Law Ctr. v. Carpinello*, 189 F. App'x 5, 8 (2d Cir. 2006).

*Brown* is distinguishable from this case. The court emphasized that "employees who commit intentional torts, and are thereby subject to punitive damages, cannot seek indemnification from the State." *Brown*, 66 F. Supp. 2d

40

at 439. Here, by contrast, the State has voluntarily paid the judgment on behalf of the employee who was found to have committed a malicious or reckless violation of rights, and who was assessed punitive damages. The conflict between the State's actions and the goal of deterrence is thus sharper here — where the State has sent the message that even malicious or reckless wrongdoers will not face financial consequences for their actions, and where the jury has awarded punitive damages with the express purpose of "punish[ing] or deter[ring] similar conduct" Dkt. No. 176, at 2–3 — than in *Brown*.[16]

A party seeking to establish obstacle preemption faces the high bar of showing that the conflict between federal and state law is "so direct and positive that the two . . . cannot be reconciled or consistently stand together." *MTBE*, 725 F.3d at 102. Williams has met that bar here. By ensuring that neither it nor Marinelli will bear the bulk of the consequences of Marinelli's malicious or reckless violation of Williams's constitutional rights, the State's

---

[16] We note that, in a case whose facts resembled the present case much more closely than any of the precedents relied upon by Marinelli did, the Eighth Circuit found that a state's application of its cost-of-incarceration statute was preempted by § 1983. *See Hankins v. Finnel*, 964 F.2d 853, 861 (8th Cir. 1992) (holding that § 1983 preempted use of Missouri Incarceration Reimbursement Act to largely recoup prisoner's § 1983 award including punitive damages).

actions have severely undermined the incentives that the judgment is meant to produce and that the jury wished to generate when it awarded punitive damages. Such a result conflicts starkly with the manifest purpose of Congress in enacting § 1983, which was to establish an effective federal remedy for violations of federally protected rights when states failed to provide such a remedy. We find no error in the district court's conclusion that the State's attempt to discharge Marinelli's judgment obligations in significant part through payments to itself and payments to Williams that the state might eventually recoup undermines the objectives of § 1983, and is therefore preempted.

Marinelli also appeals from the district court's denial of his motion for reconsideration. Marinelli offers no argument with respect to his reconsideration motion distinct from those discussed above. We therefore affirm the district court's denial of reconsideration for the same reasons that we affirm its ruling on Williams's post-judgment motions.

**C. Double Recovery**

Marinelli additionally appeals from the district court's denial in part of his motion for credit against judgment. Because he makes no arguments as to

why the district court's denial was in error apart from his central argument against the district court's finding of preemption, any such additional arguments are waived. *See Norton v. Sam's Club*, 145 F.3d 114, 117 (2d Cir. 1998) ("Issues not sufficiently argued in the briefs are considered waived and normally will not be addressed on appeal."). Nonetheless, because some of the arguments Marinelli made below were directed at preventing "double recovery" Appellant's Br. 15, we explain why our affirmance of the district court's rulings does not create the risk of double recovery.

Our ruling in no way allows Williams to receive more than his entitlement to the judgment and in no way implies that Connecticut cannot, in the Connecticut courts, recover payments it made to Williams in the mistaken belief that those payments would both satisfy the judgment against Marinelli and be available to satisfy the state's own recoupment actions. Nor does it prevent Connecticut from undoing the credit that Williams has received against his debt to the State for the cost of his incarceration by cancelling its payment to its agency. Nor does our ruling undo the credits Marinelli has received against his payment of the judgment. Connecticut is

free to seek measures that would avoid double recovery, either in the district court or in the Connecticut courts, as appropriate.

## CONCLUSION

For the foregoing reasons, the district court's rulings are AFFIRMED.